J. M. WHITTINGTON v. WESTPORT HOTEL OPERATING COMPANY and GEORGE H. SIEDHOFF CONSTRUCTION COMPANY, Appellants.— 33 S. W. (2d) 963.

Division Two, December 20, 1930.*

*Henry S. Conrad, L. E. Durham, Hale Houts* and *Ilus M. Lee* for appellants.

*Cowgill & Popham* for respondent.

DAVIS, C.—This is an action for damages for personal injuries alleged to have been suffered by plaintiff on August 12, 1925, while working as a carpenter's helper in the construction of the President Hotel in Kansas City. The jury returned a verdict for $20,000 against both defendants, and defendants appealed from the judgment entered thereon.

Hereinafter we speak of the Westport Hotel Operating Company as Westport Company and the George H. Siedhoff Construction Company as Siedhoff Company. Both plaintiff and defendants introduced evidence.

The evidence in behalf of plaintiff warrants the finding that plaintiff, then aged twenty-three years, on August 12, 1925, about three o'clock in the afternoon, while working as a carpenter's helper on the President Hotel, was injured as the result of a board, laid across an opening from beam to beam, tilting and causing him to fall from the ninth floor, a height of ten or twelve feet, to the concrete comprising the eighth floor of the building. The hotel as planned was twelve stories in height. It was being constructed of structural steel incased in concrete and with concrete floors. The vertical pillars throughout the structure and on each floor were spaced about fourteen feet apart in each direction. Plaintiff was working on the ninth floor with and as the helper of carpenter Gatlin. The concrete comprising the eighth floor had been completed, as had the ninth floor, except a strip or open space extending the length of the building from north to south, fourteen feet in width, the distance between the second and third row of pillars or columns from the west side of the building, there being completed the concrete on the east of the opening and also an area of concrete fourteen feet wide on the west side of the opening. The

concrete floors rested on steel beams. In order to bridge this opening, the erector of the building placed a plank, eight inches wide, eighteen feet in length and two inches thick, running diagonally across the opening. Plaintiff was walking on this plank over the opening when he fell to the eighth floor.

On the day in question, Gatlin, on the ninth floor, was constructing wooden forms, on the east side of the opening, to inclose the steel and into which to pour concrete. Plaintiff was working under Gatlin's orders as a helper, and at the time in question he was supplying Gatlin with lumber for the forms. Plaintiff had crossed from the east to the west and returned before attempting to walk the board at the time of injury. The ends of the board rested at each end on the completed concrete of the ninth floor. The center of the board hung two inches immediately above an I-beam connecting the pillars. The board was not fastened at either end, nor were railings provided. When walking over the board, it sprang down and rested on I-beam. Plaintiff, on going and returning across the board empty-handed, noticed that it was springy and wobbly, and told Gatlin, his boss, that he did not think it was very safe. Gatlin ordered him to carry a wooden trestle or sawhorse, weighing forty to fifty pounds, over the board, telling him to hurry up, that he was needing the material, saying, "The board is all right; go ahead." Plaintiff did not pay particular attention to the board or make an inspection. The purpose in taking the sawhorse from one side of the opening to the other was to break or saw the material for the forms into lesser parts, as the lumber in its condition was too heavy or cumbersome to traverse the board safely with it. As plaintiff was in the act of carrying the sawhorse over the opening, walking the board, the board tilted when he was about three steps or six feet on it, and he fell, striking the concrete floor below with his left foot and suffering injuries. On crossing over and back prior to his fall, he noticed the board spring down to the beam and did not consider it very safe, but he had no difficulty or trouble in crossing on it and believed he could use it safely by being careful. Plaintiff said, "I did not think the board was very safe, but I thought if I was extremely careful I could get across there." He testified that it was light and he could see the situation before him, and that in crossing when he fell, he was extremely careful, more careful than ordinarily, because of the narrow board. Upon being asked the universal custom and practice in regard to boards of that width in a place like that, plaintiff answered, "The usual practice on construction jobs is to build a wide, thick platform with a railing across it, so there is no danger of a man getting overbalanced and falling." Plaintiff examined the board subsequent to his fall, and observed that it was cupped,

but he failed to observe it on crossing over and back before he fell. He did not notice the board tilt on first crossing over, or any decided tilty effect, but he noticed the springy effect. Plaintiff's deposition was taken. He admitted he said then: "Mr. Gatlin, that plank is pretty shaky. I almost fell off there a while ago. I said it was loose." On the trial plaintiff testified: "I would not say I came very near falling. I told him (Gatlin) something like that, maybe." He said he told them that, "so that he would realize the condition of the board." Plaintiff said the board was shaky and insecure. "It seemed insecure. I did not think it was very safe."

After he fell, plaintiff attempted to work. Finding that he was in pain, he went to the office, reported the matter to Sefton, the bookkeeper, and was taken by Sefton in a taxicab to the office of Dr. Lawrence T. Jones for treatment.

Defendants' evidence tends to show that the board was ten or twelve inches in width. Defendants' witnesses Gatlin and Sefton testified that plaintiff told them that his fall was caused by the sawhorse in some manner striking the pillar as he started to cross the plank, causing him to lose his balance. Gatlin said plaintiff made no complaint about the board or its safety. Gatlin said that plaintiff was his helper, that he was subject to his orders, and obeyed his instructions. Aegerter, the superintendent, testified that Gatlin was plaintiff's boss. Gatlin said that he instructed plaintiff to carry the sawhorse over the board across the opening, and that plaintiff was obeying instructions in so carrying it. On the trial Gatlin testified that he did not give it (the safety of the board) a thought, but admitted that the board was not fastened at either end, and that it was ten inches in width, although he denied he thought it was unsafe. His deposition was previously taken and shows that he (Gatlin) had crossed over on the board several times and that it was loose and tilty, and that if the lumber, in its then condition, was carried across, there was a chance of getting overbalanced. Gatlin stated in his deposition that plaintiff might have said to him, just after the fall, that the board tilted.

Defendants' witness Vandiver testified on cross-examination, without objection, that it was customary in that kind of building work to have platforms constructed of two or three boards, twelve inches in width, to provide space to prevent an employee from losing his balance and falling. Other facts, pertinent to the issues discussed, will be adverted to in the opinion.

I. Before proceeding to a discussion of defendants' contention that plaintiff failed to make a submissible case, we think it apropos first to dispose of questions relating to the admissibility of evidence,

as the making of a submissible case, to some extent, depends upon the force of that evidence.

· (a) Plaintiff testified that, prior to June 1, 1925, he applied to the Siedhoff Company for a job, talking to Superintendent Aegerter, and that he was told by Aegerter that he could not put him on then, but to return later. Plaintiff returned on the morning of June 1, 1925, and Aegerter put him to work. Plaintiff had previously worked for the Siedhoff Company. The record then reads:

"Q. State whether or not you had a general discussion with him there in regard to the job and the work when you went to work? A. On the morning of June 1, 1925, Mr. Aegerter and I discussed the job. I said, 'Is the Siedhoff Construction Company erecting this?' and he says, 'Yes, sir; you will be working for the George H. Siedhoff Construction Company, but you will get your checks from the Westport Hotel Operating Company.'.

"Q. Now did it turn out that that was correct? A. Yes, sir; it turned out that way.

"Q. After they began paying you wages, were your checks signed by the Westport Hotel Operating Company? A. Yes, sir. . . .

"Q. State whether or not you and the other men took directions from the president of the George H. Siedhoff Construction Company? A. We took directions from Mr. Siedhoff when he was there. . . .

"Q. State whether or not after that Mr. Gatlin advised you that he and you were working for the George H. Siedhoff Construction Company.

"Mr. Lee: Just a moment; I object to that as leading and suggestive.

"Mr. Popham: Well, then, I won't ask it in a leading form,—

"Mr. Popham: Q. I will ask what Mr. Gatlin did advise you, if anything, in that connection? A. Mr. Gatlin said, we were working for the Siedhoff Construction Company."

The record shows that the foregoing conversations were admitted in evidence without an objection on the part of the Siedhoff Company. Consequently error may not be predicated thereon. Moreover, plaintiff had known Aegerter as the superintendent of the Siedhoff Company some two years before, having worked for said company, and plaintiff stated that he applied to that company for a job, pursuant to an advertisement seen in newspapers that the President Hotel was to be erected by the Siedhoff Company. Plaintiff stated that, on arriving in Kansas City, he proceeded to the site of the building and identified it by a sign, "This building being erected by the George H. Siedhoff Construction Company." George H. Siedhoff, president of the Siedhoff Company, saw the sign and

the newspaper advertisement, but never objected to them. Aegerter stated that he had been superintendnt of the Siedhoff Company for about six years previous, and that the sign was not removed until the President Hotel was practically completed. An inference may be drawn from the preceding evidence that Aegerter was the superintendent of the Siedhoff Company, and, if so, a finding was justified that the Siedhoff Company was erecting the hotel. If so, he was the *alter ego* or vice-principal of the Siedhoff Company in the hiring of employees, and they were bound by any declaration made to plaintiff relative to employment.

(b) Plaintiff was permitted to testify that he was familiar with the practice and custom on the various construction jobs on which he had worked, and in answer to a question as to what in all those jobs had been the universal custom and practice in regard to boards that width in a place like that, he was permitted, over the objection of defendants as calling for a comparison with other jobs, to testify that the usual practice was to build a wide, thick platform with railings across it. Plaintiff stated that he had previously worked on five or six jobs, including jobs for the Siedhoff Company.

Defendants renew their contention that the admission of the testimony was error, for the reason that a comparison with other jobs was improper. We do not think so. The question asked comprehended the usual method of work, either with defendant or others in the same business, under similar conditions, and was admissible to show the defendants' negligence. This appears to be the general rule. [39 C. J. 1032, par. 1242.] As the defendant Siedhoff Company seems to have established this method of protecting its employees, it is equivalent to a rule. [Gettys v. American Car & Foundry Co., 16 S. W. (2d) 85; Koonse v. Mo. Pac. Railroad Co., 18 S. W. (2d) 467.] Moreover, defendants' witness Vandiver, on cross-examination, testified, in substance, to the same custom, thus rendering the alleged error in any event non-prejudicial.

II. The Siedhoff Company asserts that the trial court erred in refusing to direct the jury to return a verdict finding for it. It concedes that the evidence as to the signs was sufficient to raise a disputable presumption in plaintiff's favor upon the issue of the Siedhoff Company employing him, but it takes the position that the presumption disappeared upon said defendant introducing positive evidence that said company was not doing the work and had no connection with it, as well as that plaintiff and the employees were the employees of the Westport Company. In connection with its position just an-

nounced, it takes the further position that Aegerter's and Gatlin's declarations to plaintiff, to the effect that they told him that the Siedhoff Company was doing the work and was the employer, were not part of the *res gestae* and were obviously hearsay, incompetent, not binding on it and of no probative force, because it is well settled that the declarations of an alleged agent are inadmissible to prove agency. To support its position, the cases of Guthrie v. Holmes, 272 Mo. 215, 198 S. W. 854, and State ex rel. v. Daues, 19 S. W. (2d) 700, are cited.

RAGLAND, P. J., in Bond v. St. Louis-San Francisco Railroad Co., 315 Mo. 987, 288 S. W. 777, has treated and clarified the force of presumptions. In the present case, the facts develop an inference at least that plaintiff was in the employ of the Siedhoff Company, thus making a prima-facie case of substantive force in that regard, and denying a court the right and power to rule as a matter of law that said company was not plaintiff's employer.

Our determination is based on the evidence adduced, which tends to show that plaintiff previously worked for the Siedhoff Company, of which Aegerter was then the superintendent, and that when he applied for work on the occasion in question, he applied to the Siedhoff Company, talking to Aegerter, superintendent. While in another state, plaintiff's attention was directed to the fact that the President Hotel was in the course of construction by the observance of notices in Kansas City newspapers, advertising and announcing that the Siedhoff Company was erecting the building. On concluding to proceed to Kansas City to obtain employment from said company, he saw, on his arrival at the building, a large sign, reading: "This building being erected by the George H. Siedhoff Construction Company."

The preceding facts were of sufficient probative force to justify the finding that the Siedhoff Company was erecting the building, and the inference that Aegerter was then its superintendent. If Aegerter was its superintendent, as the jury found by its verdict upon sufficient evidence, then Aegerter was the *alter ego* or vice-principal of the Siedhoff Company relative to employing plaintiff, and said company was bound by his declaration that the Siedhoff Company was erecting the building and that plaintiff would be working for said company, but would be paid by checks of the Westport Company. This substantive testimony was corroborated by Gatlin stating in his deposition that they were employed by the Siedhoff Company, thus probably inducing the jury to accept it as true.

The contention of the Siedhoff Company, that the presumption disappeared when its evidence came in that it was not concerned

with the erection of the building, is disallowed, not only on the ground that sufficient facts were in evidence to show the employment of plaintiff by the Siedhoff Company, but also upon the ground that the parol testimony of defendants' witnesses, without the contracts showing the builder, was not the best positive evidence obtainable. Defendants ask us to say, as a matter of law, that its parol evidence is true. This we cannot do as it was a jury question. [Gannon v. Laclede Gas Light Co., 145 Mo. 502, 46 S. W. 968, 47 S. W. 907.]

The Siedhoff Company further contends that the verdict of the jury against both defendants requires the reversal of the judgment as to it. The Westport Company admitted that it was the employer of plaintiff. It was capable of so admitting, if it desired, and was bound by the admission. This situation, however, did not preclude the plaintiff from demonstrating that the Siedhoff Company was his employer. In effect, the Siedhoff Company takes the position that the admission of the Westport Company absolves it from liability. The Westport Company's admission concerned it, not the Siedhoff Company. Be that as it may, plaintiff's evidence tended to show that the Siedhoff Company employed plaintiff, and it cannot escape liability on the theory that another defendant admitted that it also employed him. As the Westport Company admitted that it employed plaintiff and as plaintiff's evidence tended to show that the Siedhoff Company also employed him in the erection of the building, a finding that the defendants were acting in concert was justified and this is supported by Aegerter's declaration to plaintiff, "You will be working for the George H. Siedhoff Construction Company, but you will get your checks from the Westport Hotel Operating Company," and by defendants' instructions reading, in part, (D-3), "The court instructs the jury that when plaintiff accepted employment from the defendants, he assumed all the ordinary and usual risks," etc., and (D-4), "As to the degree of care required of the defendants in furnishing and providing plaintiff a place in which to work," etc.

III. Both defendants contend that the trial court erred in refusing to direct a verdict in their favor, because no actionable negligence was shown; because the plank was a simple appliance and the conditions were obvious and known to plaintiff; and because plaintiff, as a matter of law, could not and did not rely upon any assurance of safety by Gatlin.

The negligence relied upon by plaintiff was that the plank or board on which he was directed by his superior to walk to carry the trestle or sawhorse over the opening was dangerously narrow,

springy, loose, insecure and tilty, and by reason thereof not reasonably safe. With respect to traversing the board prior to the occasion on which he fell, on cross-examination, plaintiff said: "I walked carefully. I had no difficulty. The board looked a little shaky but I had no trouble with it. . . . It sprung down to the beam when I crossed it. . . . I did not think it was very safe, but I thought if I was careful I could cross it. . . . I noticed it was springy. . . . I thought it was safe,—I could return on it by being careful." Relative to the occasion on which he fell, on cross-examination, plaintiff said: "I did not think the board was very safe, but I thought if I was extremely careful I could get across there." Plaintiff testified that he was extremely careful, more than ordinarily, because it was a narrow board; that the board tipped with him and he fell; that he walked slowly and carefully because he did not know about the board. The record shows that the following occurred between plaintiff and his superior Gatlin: "A. I said, 'There is material over on the west side that needs wrecking. Give me a trestle to put it on and I can wreck it to the right size,' and he said, 'Take this trestle over there and use it,' and then I said, 'Mr. Gatlin, that board does not look safe to me,' and he said, 'Oh, it is all right; go ahead; there is a rush on.'" Plaintiff further said: "I meant it did not look safe to bring that material over there that we were going to have wrecked. . . . I thought it was safe if I was extremely careful, so I went ahead with the trestle. He was needing material." After plaintiff fell and returned to consciousness, he ascended to the ninth floor, and then examined the board, which he found warped and cupped at both ends. On first traversing the board empty-handed, he noticed the springy effect, but he did not observe that the board was warped or cupped or that it tilted.

The gist of plaintiff's evidence is that it appeared to him that, if he was careful, exercising more than ordinary care, he could safely cross on the board with the trestle. He says that he used that care. With respect to the prior use of it, he said: "I walked carefully. I had no difficulty." It may be that he thought there was some danger attached to the crossing, but unless the danger was so glaring and obvious that an ordinarily prudent man would not have attempted it, he was authorized to rely upon the assurance of safety given him by Gatlin, since he was without knowledge that the board was warped and cupped, and thus liable to tilt.

The facts in the case of Mathis v. Stock Yards Co., 185 Mo. 434, 84 S. W. 66, while similar, easily distinguish it from the facts in the present case, and, although it is unnecessary to overrule the majority opinion, the minority opinion appears the more logical.

The distinguishing features are these: In the present case, plaintiff complained to his superior and was assured that the board was safe. It was shown that the board was warped and cupped, and it may be inferred that this condition caused it to tilt. Its condition was unknown to plaintiff. In the majority opinion in the Mathis case, Fox, J., says:

"He made no complaint as to the unsafety of the appliance or the place he had to work. . . . The testimony is absolutely silent as to the cause of the tipping of the plank; whether it was occasioned from the uneven surface upon the steam chests, or from insufficient width of the plank, or the manner of movement of the plaintiff upon it, it is apparent that the accident was not caused by reason of any unsoundness of the plank."

It was negligence to furnish a warped and cupped board, liable to tilt. It is true that plaintiff knew that the board was springy and he probably knew that it was unfastened and loose, with the ends on the concrete floor, but he did not know that the board was warped and cupped and liable to tilt. That plaintiff may not be charged with a knowledge of danger so glaring and obvious as to prevent a recovery as a matter of law, is accentuated by the testimony of Gatlin that, previous to plaintiff's falling, he had walked over the board several times in accomplishing his work. Plaintiff did not assume the risk arising from defendants' negligence. If the danger was so obvious and glaring that an ordinarily prudent man would not have walked on the board, then plaintiff was guilty of contributory negligence, for the servant never assumes the risk of the master's negligence. These subjects are clarified in Williams v. Pryor, 200 S. W. 53, which announced the law in this State, although the Federal rule is different. Whether the danger of traversing the board was so obvious and glaring as to preclude a man of ordinary care and prudence from using it, was an open question, especially as Gatlin crossed on the board several times and assured plaintiff of its safety. Plaintiff was not guilty of contributory negligence as a matter of law. It was a jury question as to whether plaintiff relied upon Gatlin's assurance of safety. Consequently, the demurrers to the evidence were properly overruled. Our rulings also dispose of defendants' criticisms of plaintiff's Instruction P-1.

IV. Defendants insist that the judgment should be reversed because of improper argument of counsel for plaintiff. The record shows the following:

"This first instruction is what is known as the 'key' instruction. This one instruction covers the entire case.

"MR. LEE: Just a moment. I object to the statement if Your Honor pleases. There is no 'key' instruction.

"MR. POPHAM: Oh, I will withdraw it.

"THE COURT: The jury is to read and consider all instructions and all evidence in the case.

"MR. POPHAM: I say this instruction does constitute a key to all the facts in this case, and I will show you that it does by the instruction itself, because it winds up with the statement—if you find these facts—and it winds up, 'if you so find, then your verdict must be for plaintiff and against both defendants.' This instruction therefore is complete in and to itself, regardless of every other instruction in this case," etc.

Defendants objected to the argument, as related, but did not except or request of the court further action. The record fails to develop a further objection to the argument or an exception at any time. The record thus presents nothing to review. An improper argument is a matter of exception as well as objection. Defendants seemed satisfied with the statement of the court that "the jury is to read and consider all instructions and all evidence in the case." Whatever may have been defendants' purpose in failing to further object and except, it is evident that they may not now complain. [Gate City Nat. Bank v. Bunton, 316 Mo. 1338, 296 S. W. 375; Morris v. Union Depot Bridge & Terminal Railroad Co., 8 S. W. (2d) 11.]

V. The final complaint of defendants involves the excessiveness of the damages awarded plaintiff. In determining whether the verdict is excessive, we must view the evidence adduced in light most favorable to plaintiff.

The direct injuries suffered by plaintiff and attributable to the fall involve the left foot and the sacroiliac joint. As a result thereof, plaintiff's central nervous system was upset and disorganized, causing him sleeplessness and the loss of about twenty-five pounds in weight.

The injury to the foot consists of torn ligaments, resulting in an inverted or dropped foot, requiring the wearing of a steel brace three pounds in weight, and Dr. Jones, to whom plaintiff was taken by defendants, advised plaintiff that he would probably have to wear it always. Dr. Jones, on first treating plaintiff, encased his leg in a plaster cast, and testified on the trial, after some months of treatment: "The result was so disappointing—I was disappointed he did not improve, apparently; that is all I can say." Dr. Jones's testimony was to the effect that if, after a year and nine months, the foot was still inverted and had a tendency when he tried to put it down to turn up, and his ankle is still weak and he has not the control over the motions of it, the conditions would indicate a

permanent disability. Plaintiff, a year and nine months after the injury, on the trial stated that he could not walk without the brace and that he had a heavy limp. The left ankle is enlarged and the left leg is flabby, atrophied and shrunken, getting smaller, and the condition is progressive and the prognosis unfavorable.

The left sacroiliac joint has been rendered movable and painful, producing spasms of the muscles of the hips and back. The entire spine is involved and is tender and painful, producing frequent urination. As the result of the trauma, he suffered a definite concussion of the brain and spine.

Plaintiff stated that he took all the exercise possible, but, if he exercised overmuch, the pain is constant and unbearable. Exercise was practically limited to walking in the yard. Hot soaks, as advised by Dr. Jones, were used nightly to relieve pain. He lies with a pillow under his back and to ease his pain his father and sister massage him. On occasions he sleeps three hours only at night. The pain in the small of the back is intense, extending to his neck and head, and he suffers from dizzy headaches and head pains and nervous twitching. His eyes are so affected that after reading a short time he is required to stop and bathe them, and reading any length of time causes dizziness with blinding flashes and head pains. The eye pupils are enlarged. He is unable to labor or do work of any kind and his condition is that of weakness.

Plaintiff earned six dollars a day and his expectancy was thirty years. If he worked every working day in the year, his earnings each year would total over $1,800. But say we take $1,500 a year as his earning power. Invested at six per cent, a fund of $25,000 would be required to earn it. Plaintiff's life expectancy in this sum, according to the tables, at the age of twenty-three, would amount to over $20,000. From the evidence it is probable that plaintiff never again will be able to earn a living as the result of labor. He is entitled to a large sum for the pain and suffering he has endured and will endure, as well as his disfigurement and personal inconvenience. If the evidence was true, and we must so accept it in the light of the verdict, the verdict was not excessive.

The judgment is affirmed. *Henwood* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. *Blair, P. J.,* and *White, J.,* concur; *Walker, J.,* absent.