MICHAEL ROUCHENE v. GAMBLE CONSTRUCTION COMPANY, a Corporation, Appellant.—89 S. W. (2d) 58.

Division One, December 18, 1935.

AFFIRMED.

*Wilton D. Chapman* for appellant.

*Everett Hullverson* for respondent.

HYDE, C.—This is an action, by an employee of a subcontractor, against a general contractor for the construction of a building, for damages for personal injuries alleged to have been caused by the failure of the general contractor to comply with Section 13275, Revised Statutes 1929. Plaintiff obtained a verdict for $35,000. The trial court ordered a *remittitur* of $12,500 which was made, and judgment was entered for plaintiff for $22,500. Defendant has appealed from this judgment.

Plaintiff's petition contained several assignments of common-law negligence concerning the safety of his place of work. These, however, were all abandoned and plaintiff submitted his case upon an instruction based solely upon the violation by the general contractor of Section 13275. Defendant contends that the court should have sustained its demurrer to the evidence, saying that plaintiff was guilty of contributory negligence as a matter of law and that Section 13275 is not applicable to the facts of this case. The evidence viewed from the standpoint most favorable to plaintiff's contentions, as we must consider it in ruling this question, tends to show the facts and circumstances hereinafter stated. Defendant was the general contractor with the owner of the St. Louis Mart Building to construct the superstructure for a large eighteen story building and, "under the terms and plans and specifications the general contractor had to provide the barricades and safeguards." Plaintiff was employed, by defendant's cement work subcontractor, as a concrete finisher. His work on this building was to complete a finished surface over rough concrete floors. This was skilled labor for which plaintiff drew $1.62½ per hour and double time for all overtime. It was shown that plaintiff's earnings had averaged $5000 per year, which would make the Workmen's Compensation Act inapplicable to his case. [Sec. 3305, R. S. 1929.]

On the day plaintiff was injured, he worked on the second floor of the building. He started there about eight o'clock in the morning, working "from the east end—about the middle of the building" and worked there until noon. When he went back in the afternoon, his foreman sent him to the north end of the building to help another finisher named Youngberg "pull a straight-edge." He was injured about one-thirty o'clock, "just a few minutes" after he went to work there. A straight-edge, used for finishing floors, was about six inches wide, two inches thick, and from sixteen to twenty feet long, depending upon the distance between columns. Around openings, a shorter straight-edge was used by one man. Over most of the floor areas, the long straight-edge was pulled by two men. About an inch or an inch and a half of finishing material would be put over a rough concrete floor to be smoothed and shaped by pulling the straight-edge over it. A man would take hold of each end of the long straight-

edge with both hands and pull it by walking backward bent down over it. This was hard work, which took strength as well as skill. The men "worked fast all the time" pulling the straight-edge over the finishing material, and at the same time watching the result of their work carefully to see that the floor was leveled up "nice" with "no humps or holes." They "always started at the wall" and "always come backwards." A foreman tells the finishers "where to start from" and "the way we are going," but the men being skilled workmen knew how the work "was to be done." The foreman "watches" their work, however, and "if he wants any change he always tells" them. Since the men had to work fast and "had to watch the straight-edge all the time," they did not have much chance to look back of them as they worked.

Plaintiff and Youngberg started from the north wall and when they had pulled the straight-edge south about fifty feet, plaintiff fell through an opening in the floor about eight feet wide and twelve feet long, which had been provided for a stairway to the first floor. Both plaintiff and Youngberg said they did not see the hole and did not know it was there. Youngberg said he knew about elevator holes but they were located farther back in the building. Youngberg said that when plaintiff fell he was "dumbfounded" and "didn't know what in the world took place." Plaintiff had not worked "right at that place" before lunch, and "had been in that locality just a few minutes." Plaintiff said: "When we work around these kind of buildings, the holes are supposed to be closed up, but we worked fast when we started. We haven't any time to look around for holes." Plaintiff had been working on the building about six weeks. He had not worked on the second floor before but had worked on about seven other floors. He said that "there was pretty fair light;" that "you could see what you were doing;" that there was nothing to prevent him from seeing the hole but he did not see it; that he "looked," when he started back, but "never seen the hole;" and that his foreman did not tell him about it. Youngberg said that he "didn't have any idea of any hole there;" that at the time plaintiff fell he did not see any guard around this hole; but that one was put up the day after the accident. Another witness, who "was a cement finisher following up Rouchene and Youngberg," saw plaintiff fall. He said, "there was no guard around this hole," but one was put up the next day. He also said that "the hole was flush with the floor;" that "if you were . . . thirty feet . . . away from it you wouldn't even know the hole was there;" and that "when you get within twenty feet of the hole the light coming through from the first floor would attract your attention to it."

Defendant's evidence was that they had barricades, around all openings, made by wedging four by four timbers between the ceiling and

the floor so that they stood upright at each corner of the opening, and by putting two strands of No. 9 wire (smaller than a pencil in thickness) around them; the first wire would be from two to three feet from the floor and the second about four feet. These barricades would be placed from eighteen inches to six feet back of the opening. The defendant claimed that all openings were thus barricaded; that there were forty holes up to the tenth floor and thirty above, all of which were inspected five times every day; that sometimes contractors would take the barricades down in order to do work near the openings; and that defendant's carpenters would put them up again as soon as they were found. Defendant's evidence also was that there was such a barricade on that day around the hole into which plaintiff fell; that it could not have been pulled down or broken by a man backing into it; that one of the four by fours was found hanging into the opening with the wire attached to it after plaintiff fell; that defendant's carpenter repaired it "the day after the accident;" that one of the men in plaintiff's gang had asked permission of defendant's superintendent to take down this barricade but that this permission had been refused; and that these uprights could only have been removed by knocking them out with a hammer. Cross-examination of one of defendant's witnesses tended to show that sometimes the bottom wires were as high as three feet, and that under such circumstances a man stooped down walking backward could go under it.

Did plaintiff make a case of violation of Section 13275? This section contains the following provision:

"If the elevating machines or hoisting apparatus are used within a building in the course of constructing for the purpose of lifting material to be used in such construction, the contractor or owner shall cause the shafts or openings on floor where material is loaded to be completely inclosed on all sides; except opening not over eight (8) feet high and the width of the elevating machines for loading purposes. On the other floors the shafts and *all other openings shall be enclosed or fenced in on all sides* by a substantial barrier or railing at least (3) three feet in height."

This section is now a part of Article 7, Chapter 95, Revised Statutes 1929. All of Article 7 was added to Chapter 95, at one time, by an act of the 1927 Legislature (see Laws 1927, p. 276) entitled: "AN ACT to provide for the protection and safety of persons in and about the construction, repairing, alteration or removal of buildings, bridges, viaducts and other structures; to provide for . . . the erection of safety railings; . . . the inclosing of elevator shafts; the closing of all openings in floors; . . . and providing for the inspection of same." By this act the Legislature undoubtedly intended to place a duty, upon contractors constructing buildings, to maintain a higher standard of care, in the specific instances pro-

vided for therein, than was required of them under the common law. Without this statutory duty to provide the safeguard of a barricade at such an opening, we would probably have to hold that it would not be negligence on the part of defendant to merely fail to barricade stairway openings in the floor of· such an unfinished building; that any risk of falling into them was one of the ordinary risks, incidental to such employment, assumed by the workmen engaged thereon; and that they were required to look out for themselves for protection against risks of this character. [Schaum v. Southwestern Bell Telephone Co., 336 Mo. 228, 78 S. W. (2d) 439; Goodwin v. Missouri Pacific Ry. Co., 335 Mo. 398, 72 S. W. (2d) 988; Kelso v. Ross Construction Co., 337 Mo. 202, 85 S. W. (2d) 527.] The application of the common-law rule imposing the duty of furnishing a safe place to work is necessarily somewhat modified where conditions are constantly changing, as in the construction work. [Kelso v. Ross Construction Co., 337 Mo. 202, 85 S. W. (2d) 527; Cain v. Humes-Deal Co., 329 Mo. 1107, 49 S. W. (2d) 90.]

Section 13275, however, provides definite standards which contractors must comply with, just as railroads must comply with the standards of the Federal Safety Appliance Acts in furnishing railroad equipment. The violation of this statute would, therefore, be negligence *per se* on the part of defendant. [See Kelly v. Hamm Brewing Co. (Minn.), 168 N. W. 131; Malloy v. Marshall-Wells Hardware Co. (Ore.), 173 Pac. 267, 175 Pac. 659, 176 Pac. 589; 39 C. J. 415, sec. 533; 45 C. J. 871, sec. 295.] Of course, this section could not apply from the very beginning of the construction of a building because, when only framework is in place, it is then all open, and it would likewise seem unreasonable to construe it to mean that openings were required to be enclosed before or while floors were still being constructed. However, we think this section was clearly intended to apply to a building, at the stage of construction shown to have existed in this case, that is, the floors in place with all of their rough concrete work completed, so that the only openings in them were the permanent openings to be used for elevators and stairways after the building was completed. We, therefore, hold that plaintiff was entitled to submit his case upon the violation of this statute.

Was plaintiff guilty of contributory negligence as a matter of law? Negligence, either contributory or primary, of course depends upon surrounding circumstances, as well as upon the particular conduct involved, because an act or omission which would clearly be negligence under some circumstances might not be negligence under other circumstances and surroundings. Negligence is always a question for the jury "when the evidence on material points is conflicting, or where, the facts being undisputed, different minds

may reasonably draw different conclusions from them. . . . If the inferences to be drawn from the evidence are not certain or uncontrovertible, the question of negligence cannot be passed upon by the court." [Frese v. Wells (Mo.), 40 S. W. (2d) 652, and cases cited; Simpson v. St. Louis-San Francisco Ry. Co., 334 Mo. 1126, 70 S. W. (2d) 904.] Defendant cites cases of failure to look for holes, obstructions or other dangers under circumstances entirely different from those shown in this case, where, according to defendant's own evidence, barricades were being maintained at all openings, although whether or not these barricades were sufficient to comply with the statute was at least a jury question. According to plaintiff's evidence also, holes in floors were customarily closed up at the stage of construction when he was called upon to do the finishing work on the floors. If that is true, and there is no dispute between plaintiff and defendant about it, would ordinary care require that he be continually looking for unguarded holes at places where he did not know there were any holes? It would seem to be, under this evidence, at least a jury question whether the hole was so obvious that plaintiff must have seen it.

In this instance, plaintiff says he was instructed by a foreman where to begin and which way to work. Would a reasonably prudent man so instructed, under these circumstances, anticipate that there might be unguarded holes in the path over which he was told to work? When he started to work with a straight-edge long enough to require two men to pull it, he had to work backward and give his attention to the result of the work so that he could hardly be expected thereafter to be looking for holes or obstructions in his path. It is, of course, usually contributory negligence as a matter of law to approach a place of known danger without looking, but plaintiff's evidence here tends to show that he did not know about the existence of this opening; that there was no barricade around it at that time; that he did not see it when he started; that it was, at least, very difficult to see it from the wall; and that it was not so reasonably apparent that one would be likely to see it until within twenty feet of it. If his foreman, under these circumstances, directed him to start at a place from which he was required to move backward toward this hole, and he did not see it or know about it, we do not think the court should say that he was guilty of contributory negligence as a matter of law in working in the direction he was instructed to work without looking again. An employee, proceeding to work as he has been directed to do it, is only guilty of contributory negligence as a matter of law when the danger of doing so is so obvious and glaring that no reasonably prudent person in the exercise of ordinary care would undertake to do so. [Jablonowski v. Modern Cap Co., 312 Mo. 173, 279 S. W. 89; Mueller v. Ralston-Purina Co. (Mo. App.), 254 S. W. 720; Van Bibber v. Swift & Co., 286 Mo. 317,

228 S. W. 69; Ingram v. Prairie Block Coal Co., 319 Mo. 644, 5 S. W. (2d) 413; Messing v. Judge & Dolph Drug Co., 322 Mo. 901, 18 S. W. (2d) 408; Sloan v. Polar Wave Ice & Fuel Co., 323 Mo. 363, 19 S. W. (2d) 476.] We, therefore, hold that contributory negligence of plaintiff was a jury question and that the court did not err in overruling defendant's demurrer to the evidence.

■ Defendant assigns as error the refusal of its offer to prove that for twenty years contractors in St. Louis had been enclosing floor openings in buildings under construction with post and wire barricades of the type defendant said was used in this case. We hold that this was not error in this case, both because plaintiff was basing his right to recover here upon the claim that there was no barricade at all at this opening and because, while such evidence might be competent upon an issue of common-law negligence, it would not be relevant on the question of whether defendant had complied with an entirely different statutory standard.

■ Defendant complains that the court erred in giving plaintiff's Instruction 2 and in refusing defendant's Instruction C. Defendant says that by Instruction 2, any question of whether or not defendant was the general contractor was eliminated and that it unduly emphasized the legality of plaintiff's right of action. This instruction merely informed the jury that plaintiff was not barred from suing defendant, for injuries sustained as a direct result of defendant's negligence, if any, because he had been paid some compensation by his immediate employer, defendant's subcontractor, on the theory that the Workmen's Compensation Act applied to his case. Plaintiff's main instruction required the jury to find that defendant was the general contractor having the duty of complying with the statutory requirement of fencing the opening. We, therefore, hold that there was no prejudicial error in giving Instruction 2. For the same reason there was no prejudicial error in refusing defendant's Instruction C, which would have again required the jury to find that defendant was the general contractor for the erection of the building. Moreover, Instruction C was erroneous for the reason that it directed a verdict against plaintiff unless the jury found that defendant, in addition to being the general contractor for the erection of the building was also general contractor for "all of the appurtenances thereof" and also unless "the subcontractors doing work on said building were all under the control" of defendant. This would have made it impossible for plaintiff to obtain a verdict, because it was uncontradicted that there were heating contractors, electrical contractors, plumbing contractors, and excavating contractors who were not subcontractors under defendant. The fact that the owner had contracted, for preliminary excavation, or for wiring, heating or plumbing equipment, directly with other contractors than defendant would

not relieve defendant of the duty placed upon a contractor constructing a building by Section 13275.

Defendant further complains that Instruction 3 is erroneous as a vicious comment upon the evidence. It is not erroneous for that reason because it does not comment upon any evidence. It is an instruction upon the burden of proof, which recognizes that plaintiff is required "to prove the case by the greater weight or preponderance of the evidence" and says that it is for the jury to determine "where the greater weight or preponderance lies," but goes further and says that plaintiff is entitled to a verdict if "the evidence in this case preponderates in plaintiff's favor, *although but slightly.*" There may be some basis for such a statement found in the language of the court in Bauer Grocery Co. v. Sanders, 74 Mo. App. 657, 1. c. 660. [See, also, 1 Randall on Instructions, 488, sec. 252.] However, statements made in opinions *arguendo* are not meant to be used in instructions to juries and may be misleading rather than helpful when taken out of their context and put into an instruction. [See Geismann v. Missouri-Edison Electric Co., 173 Mo. 654, 73 S. W. 654; Sanders v. City of Carthage, 330 Mo. 844, 51 S. W. (2d) 529.] While we do not agree that the matter ought to be so stated to the jury, we do not feel that it should be held reversible error, in this case, in view of the fact that defendant's Instruction 6 defined the term "preponderance of the evidence" as "the greater weight of the credible evidence to the reasonable satisfaction of the jury that the charge is true," and further told them that if they found "the evidence touching the charge of negligence against defendant to be evenly balanced," defendant was entitled to a verdict. Technically, this latter statement would imply the same thing as was stated in plaintiff's instruction. We note further that defendant's instruction on the burden of proof also contained the erroneous requirement noted in Aly v. Term. Railroad Assn., 336 Mo. 340, 78 S. W. (2d) 851; Collins v. Beckmann (Mo.), 79 S. W. (2d) 1052, and Sheehan v. Terminal Ry. Co., 336 Mo. 709, 81 S. W. (2d) 305, requiring the jury to find for the defendant if "the truth as to the charge of negligence remains in doubt in your mind." Therefore, defendant did not get the worst of this submission as to burden of proof.

Instructions on burden of proof should not state too many technical rules and, if an attempt is made to go into degrees of preponderance of evidence, it is almost certain to get the matter so complicated that a jury of laymen will have no idea at all as to what is meant. "A short, simple instruction, telling the jury that the burden is on plaintiff to prove his case by a preponderance or greater weight of the credible evidence, and that unless he has done so the jury must find for defendant, ought to be sufficient to inform the jury what plaintiff is required to do. A plain declaration to that effect

will be easily understood by a jury. The more the instruction is elaborated upon, the more complex it becomes and the more it is likely to be misunderstood." [Mitchell v. Dyer (Mo.), 57 S. W. (2d) 1082, 1. c. 1083; 23 C. J. 16, sec. 1749.] Certainly all that ought to be required, in addition to such a statement as to which party has this burden, should be a clear definition of preponderance of evidence, informing the jury that what is meant thereby is evidence which is more convincing to them as worthy of belief than that which is offered in opposition thereto. [See 1 Randall, chap. XVII, secs. 245-256; 3 Randall 2684, sec. 2354; McQuillin on Instructions, 204-205, secs. 255-256; 23 C. J. 16, sec. 1749; 10 R. C. L. 1012, sec. 204; see, also, Hite v. St. J. & G. I. Railroad Co. (Mo.), 225 S. W. 916; In re Trautmann's Estate, 300 Mo. 314, 254 S. W. 286; Peppers v. St. Louis-San Francisco Railroad Co., 316 Mo. 1104, 295 S. W. 757.]

Defendant objects to plaintiff's Instruction 4 on the ground that it permitted the jury to assess double compensation. Defendant does not point out how this is authorized by the instruction, and we do not see that it is susceptible of such criticism.

Defendant strenuously contends that plaintiff's attorney's statements to the jury, in his opening statement and in his argument after the evidence was heard, were so improper and prejudicial that the judgment should be reversed and a new trial granted for that reason. While plaintiff's attorney was making his opening statement the following occurred:

"Mr. HULLVERSON: Michael Rouchene at this time is thirty-seven years of age. He is the plaintiff in this case. He came to St. Louis from Austria-Hungary about twenty-five years ago. He landed in St. Louis. I think he started to learn his trade in Austria as a cement finisher and worked at practically nothing other than that all of his life. The evidence will show that he was engaged in doing that work in New York at the time the war was declared. He had just got out his first papers as a citizen at that time, desiring to make this country his adopted country.

"Mr. CHAPMAN: I object to all of that. It has nothing to do with this lawsuit.

"Mr. HULLVERSON: Well, we won't go into the paper proposition.

"Mr. CHAPMAN: Or about making the papers. Let's get down to the lawsuit.

"Mr. HULLVERSON: All right. Gentlemen, it is important with reference to something that might come up with respect to his injury. He received a leg injury in the army, and some of the injuries we are talking about are leg injuries, and I merely wanted to go into that. *I understand he was injured in one of the battles and received the Croix de Guerre.*

"Mr. CHAPMAN: I am going to move for the discharge of the jury, and that a mistrial be declared.

"Mr. HULLVERSON: I don't know that there is anything wrong about that.

"Mr. CHAPMAN: I make that motion.

"The COURT: I don't think that has anything to do with this case.

"Mr. HULLVERSON: I won't say anything further about it.

"Mr. CHAPMAN: I would like for a ruling on the motion.

"The COURT: The jury will be instructed—

"Mr. CHAPMAN (interrupting) : I am asking you to rebuke him also.

"The COURT: I will overrule the motion to discharge the jury, but to disregard that remark, and to call upon them only to pass upon these injuries received in this accident, and nothing other than that. Let's confine ourselves to that."

In the opening argument of plaintiff's attorney, to the jury, after the evidence had been heard, the following occurred:

"Mr. HULLVERSON: I think that the thing to determine now is, assuming that this defendant has been guilty of this violation of law, how much have they damaged this man? Gentlemen, sometimes that is a difficult proposition, so I am going to lend whatever aid I can in helping you to arrive at something that is fair. Mike Rouchene came to this country a boy—a fine boy. Nobody testifies to the contrary, and he remained here. *He thought enough of his adopted country to go to war for that country.*

"Mr. CHAPMAN: Now, if the Court please, wait just a minute. I am going to object to that.

"Mr. HULLVERSON: The testimony—

"Mr. CHAPMAN (interrupting) : Just a minute, please, sir. I am going to object to that, and again I am going to move for a mistrial and the discharge of this jury, for that remark, coupled with the remark by counsel in the impaneling of the jury, is intentionally designed to prejudice this jury and to accomplish that purpose.

"The COURT: That doesn't mitigate or increase his injuries. We are interested in just what damages he has received in this case, and the jury will be instructed to disregard that.

"Mr. CHAPMAN: And I move to reprimand counsel and discharge the jury.

"The COURT: I asked him not to refer to that."

On both occasions an exception was saved on behalf of defendant because of the refusal of the court to discharge the jury.

Of course, it would not be proper to argue, as a basis for a recovery, that plaintiff's war record entitled him to have any larger verdict for the same injuries than anyone else. Where plaintiff came from and what his war service was had nothing whatever to do with wheth-

er or not defendant was liable to him for his injuries or how much damages would reasonably compensate him therefor. However, we can hardly believe that any jury of reasonable men could be persuaded to think so and we do not understand that plaintiff's attorney was attempting to argue any such thing. This was not a matter like liability insurance which a jury might think should make some difference in what a defendant would be required to pay. The fact that plaintiff had so served was necessarily brought into the case because he was claiming damages for a leg injury. He had received a leg wound in the war, and the extent of this war wound was properly explained. Plaintiff's attorney was not attempting to criticise or ridicule defendant or to say anything that would create ill will, hatred, or prejudice against the defendant. He was only attempting to praise his own client by claiming good qualities and proper action on his part. Lawyers usually try to present their own clients in as favorable light as possible to the jury so that they will be more inclined to consider them worthy of belief and in order to remove any basis or prejudice against them. The statement that plaintiff went to war for his adopted country was true and, while it was immaterial, it was based on testimony which had been received without objection. This is a different matter from attempting to prejudice the jury against the defendant and, while such praise might be overdone to such an extent as to warrant the discharge of the jury or a reversal for failure to do so (especially if it amounted to a comparison of the actions of the respective parties in regard to some outside matter), it is at least a matter to be ordinarily dealt with by the trial court in the exercise of its discretion and upon its observation of its importance and effect.

The trial court here did instruct the jury on both occasions to disregard these statements (concerning receiving the *Croix de Guerre* and going to war for his adopted country); and the court further informed them that their duty was to determine what injuries plaintiff had received and the amount of his damages, and told them that the fact that he had a war record did not "mitigate or increase his injuries." Only a portion of plaintiff's argument is given. The whole matter of prejudicial argument was before the trial court upon motion for new trial, and the trial court which has the best opportunity to judge its propriety, its effect, and what action will make it harmless, under all the circumstances, considering the behavior and intelligence of the jury and other incidents of the trial, overruled defendant's contentions about its effect. The trial court is allowed large discretion in permitting or restraining arguments, and in the manner in which they shall be restrained, either by rebuke to counsel or instructions to the jury, when restraint is necessary. Counsel is allowed to state the evidence and all reasonable inferences most

strongly for his client, and especially, where only a fragment of the argument is before this court, it will not interfere unless it clearly appears that the trial court abused its discretion in failing to restrain the argument. [Marlow v. Nafziger Baking Co., 333 Mo. 790, 63 S. W. (2d) 115; Goyette v. St. Louis-San Francisco Railroad Co. (Mo.), 37 S. W. (2d) 552; Kelso v. W. A. Ross Construction Co., 337 Mo. 202, 85 S. W. (2d) 527.] We cannot say that there was such an abuse of discretion by the trial court in this case and therefore overrule defendant's assignments of error concerning the arguments made by plaintiff's counsel.

It is contended that the present judgment of $22,500 is still excessive. Plaintiff's evidence tended to show the following facts concerning his injuries. He fell on a pile of pipe and was unconscious for some time. He remained in the hospital almost three months. His most serious injuries were a fractured pelvis and compound comminuted fractures of the bones of the forearm both at the wrist and at the elbow. The ulna, "the bone on the little finger side of the hand" was "broken into multiple fragments" at the elbow. This not only was a break of the ulna in the elbow joint but it was also "broken into the process in which the ulna sets at the lower end of the humerus." This part of the joint remained "roughened and irregular," which left it "painful to use." Plaintiff also had a fracture of both bones of the right forearm at the wrist. The knob or styloid process of the ulna was "broken off." "It has never healed and never will." There was a longitudinal fracture of the radius through the joint. "The internal rotation of the wrist was limited by these injuries." The movement of his arm was limited so that he could not straighten out his right elbow. He was able to turn the palm of the hand down but could not twist it in an upward position. The wrist and elbow injuries were said to be permanent. Plaintiff also had a permanent injury to his shoulder, although no bones were broken, so that he could not raise his arm above it. The joints of the wrist, elbow, and shoulder all "grate or crepitate on motion," and an arthritis or inflammation has developed in these joints. Plaintiff sustained fractures of two of the bones of the pelvis. The ishium on the right side was "broken in two." "It is the weight bearing part of the bony structure." This has left an "inflammatory condition about his right sacroiliac joint." There was "also a fracture of the ramus of the pubic bone that forms the front portion of the pelvis." The fractures through both the pubic bone and the ishium "have healed but there has been some little change of position of the pelvis," which would cause a muscle pull and a limp. Plaintiff had "to have a cane to walk now," and "there is a definite stiffness and rigidity of both hips with reference to their motion on the pelvis." Plaintiff's hearing was diminished "due to the injury to his head,

probably some minute hemorrhage." There was evidence that he had a severe concussion of the brain which was sufficient to cause "actual damage to his brain structure" and an "enormous shock to his nervous system," which would cause nervousness and headaches. Plaintiff was still nervous and often had to be given medicine "to relieve his pain" and "to make him sleep." Plaintiff said that his wrist, elbow, shoulder and spine all caused him pain and that he had frequent headaches. Plaintiff was totally disabled from ever doing the work of a concrete finisher. Medical testimony of defendant showed that "he will not recover the full use of the injured parts, but he could recover the practical use of those parts."

Of course, fixing compensation for personal injuries can at best only be a matter of estimate within the limits of what may seem to be reasonable or unreasonable. Other decisions are only guide posts and not definite yard sticks. Plaintiff's injuries are somewhat similar to those of the plaintiff in the case of Frese v. Wells (Mo.), 40 S. W. (2d) 652, where a larger verdict was reduced to $22,500 by *remittitur* ordered by this court. The arm injuries in the Frese case did not include an elbow fracture; in that case, there was a fracture of the leg bone into the hip joint instead of, as here, broken pelvis bones; the disabling effect of the injuries would seem to have been about the same in both cases; and there was apparently no head injury there as in this case. A computation under the rules of the statutory mortality tables was made in the Frese case, based upon the age of the injured man and his earnings, to demonstrate what amount would be reasonable. Plaintiff in this case was a younger man (35 years old when injured) and showed considerably greater earning capacity ($1.62½ per hour, double pay for overtime, and about $5000 annual earnings), so that a similar computation here would certainly justify the same amount as was sustained in the Frese case. [See, also, Simmons v. Kansas City Jockey Club, 334 Mo. 99, 66 S. W. (2d) 119; Gately v. St. Louis-San Francisco Ry. Co., 332 Mo. 1, 56 S. W. (2d) 54; Wack v. Schoenberg Mfg. Co., 331 Mo. 197, 53 S. W. (2d) 28; Martin v. St. Louis-San Francisco Ry. Co., 329 Mo. 729, 46 S. W. (2d) 149; Potashnick v. Pearline, 43 S. W. (2d) 790; Whittington v. Westport Hotel Operating Co., 326 Mo. 1117, 33 S. W. (2d) 963; Smith v. Acme Boiler & Tank Co., 326 Mo. 734, 32 S. W. (2d) 576.] It would seem that the *remittitur* ordered by the trial court herein was based upon standards approved by this court and we, therefore, hold that the present judgment in this case is not excessive.

The judgment is affirmed. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.