James L. Russell v. James J. Johnson, Appellant.—160 S. W. (2d) 701.

Division One, December 16, 1941.

Rehearing Denied, February 26, 1942.

Motion to Transfer to Banc Overruled, April 16, 1942.

*Oscar S. Hill* for appellant.

*Harold E. Neibling, Lon J. Levvis, Cowgill & Popham* and *Sam Mandell* for respondent.

BRADLEY, C.—Action for personal injury. Plaintiff obtained a judgment for $18,000. Motion for new trial was overruled and defendant appealed.

Defendant had leased from the Kansas City Southern Railway Company about 200 acres of farm land in what is called the East

Bottoms of Kansas City. Plaintiff was employed on the farm by defendant, and alleged that his "work and duties consisted of cooking for defendant's employees on said place, of working in the fields and doing chores as his cooking duties permitted," and such other work as defendant, or his foreman, directed. The Kansas City Southern tracks run east and west on the south side of the leased land. About a quarter of mile west of the house on the place, the railroad tracks pass over an underpass through which a public road extends north and south. The underpass walls are of concrete and extend some distance north from the underpass.

Plaintiff alleged that the tops of the north side underpass walls near the railroad track were "many feet above the surface" of the public road, "but at the extreme north ends of said walls their tops were only a little above the surface of the adjoining ground, so that at the north end of the east one of said walls a person easily could step up onto said wall; that then by walking southwardly along the top of said wall one could reach and go upon or across said railroad right of way; and that said east wall was used much for such purpose; . . . that the tops of said walls had been made about one foot thick and then had been finished with cement caps which tapered in or were bevelled off on the edges so that the top surfaces of said walls were only a few inches wide; that at and for some time prior to the time of plaintiff's said injury said top caps had become cracked and broken in places so that the top surfaces of said walls were uneven and rough; that by reason of said height, narrowness, and rough and uneven condition of the tops of said walls, or either of said conditions, it was not reasonably safe, but was unsafe and dangerous for plaintiff to be required to carry any heavy object or load along the top of either of said walls, for in so doing he was likely to become over-balanced or to slip or trip and lose his footing and thereby be caused to fall and be injured, all of which facts defendant and his superior over plaintiff knew, or by the exercise of ordinary care, could and should have known at and before the time of plaintiff's said fall; that notwithstanding said facts defendant, through his foreman and superior over plaintiff, carelessly and negligently required plaintiff to get some coal that defendant's foreman had seen lying on said right of way near said underpass, and carelessly and negligently ordered and directed plaintiff to put the same in sacks and to bring said sacks of coal down by way of the top of one of said underpass walls, and carelessly and negligently assured plaintiff that he could safely do so; that plaintiff, not knowing or appreciating said danger or the imminence and certainty thereof, but relying upon said directions and assurance and upon the judgment of his said superior proceeded to get and bring said coal in said manner in obedience to said orders and directions; and that while plaintiff was carrying a sack of said coal along said east wall he fell therefrom and was injured."

The answer was a general denial, coupled with pleas of contributory negligence and assumption of risk. The reply was a general denial.

Error is assigned on the refusal, at the close of the case, of defendant's request for a directed verdict; on instructions, given and refused; and on an alleged excessive verdict.

The evidence is not set out in the record in narrative form. In the briefs, both sides, in dealing with the facts, quote from the evidence as it appears in the record in questions and answers. Plaintiff's own evidence, rearranged and in the narrative for the most part, may be stated as follows:

"At the time of injury I was 53 years old; had worked for defendant 7 or 8 years in the store, on the farm, etc. I got $5.00 per week and my keep. Sometimes, 6 or 8 men were employed on the farm. I stayed at the house on the farm about a quarter of a mile east of the underpass and about 100 yards north of the railroad, and did the cooking. Defendant did not furnish the necessary fuel; I had to pick up fuel along the railroad track. He said I could pick up old boards and broken ties along the railroad track; that he couldn't afford to buy coal. On the afternoon that I was injured, I was repairing a corn crib and Mr. Garrison, my foreman, told me to get some sacks and go up along the railroad track and pick up some coal he had seen knocked off the cars. I said to him, 'How do you expect me to get it; I don't have any boots and I will get my feet wet.' It was a cold, disagreeable, drizzly day, muddy and slushy. You would go into it over your ankles, plumb up to your shoe tops. There was no other way to go except over the underpass wall, without going a quarter of a mile below the house, and then around up there and back under the underpass. Mr. Garrison told me to go and walk the underpass wall, and get a couple of sacks of coal. He told me where the coal was. He said that it was right up west of the underpass, lying along the track. He told me to get a couple of sacks of coal and bring it over to the north end of the underpass wall, by the road there, and he would come up with his car and get it and haul it to the house. I said I didn't know whether I could walk the wall or not, and he said that he knew damn well I could if I would be careful, so I went on and went over the underpass east wall. I walked the east underpass wall; at its north end it comes down close to the ground. It got higher up towards the railroad track. It was concrete and was flat on top and 8 or 9 inches wide, and was 8 or 9 feet high where I fell.

"I went over and filled up the two sacks with coal; each would have weighed 70 or 75 pounds; carried them to the edge of the trestle over the underpass. I put one of the sacks on my right shoulder, holding the sack with one hand, and the other hand on my hip and started back across the wall. I had been kicked a few days before, and had a couple or three of my ribs fractured on the left side. I

had gone 15 or 20 steps out from the trestle; was careful and trying to watch where I was stepping. I was watching where I was stepping the best I could, and was walking slow. Q. And then what happened, if anything? A. Well, sir, I got out there about twelve or fifteen or twenty steps and my right foot rolled and I got overbalanced and fell. Q. You say your foot rolled? A. Yes. Q. Rolled on what? A. I don't know. It must have been on some of that gravel on top where the cap was broke off.''

On cross-examination plaintiff testified: ''Q. How rough would you say it (the wall) was? A. Just like any other concrete wall. If you had a cap on and broke off a chunk, there would be a rough place there. Q. Where the cap was broken off, would that portion of the wall be, would you say, 3 or 4 inches lower than the normal top of the wall? A. Yes, 2 inches; one and a half or 2 inches. I never measured it. Q. Was there a lot of loose gravel on the wall? A. Some places there was loose gravel on it, yes. Where that stuff wears down in the concrete cap and where you break it down, there would be some little fine, loose stuff left on it. I fell on the west side into the public roadway and the sack of coal fell on the east side.

''I told Mr. Garrison that I didn't think I could make it. I never had walked across the wall. I knew the wall was high and knew it was broken. I knew the wall was rough on top in places. Q. You knew those iron spikes stuck out of it? A. There was some iron brace rods in there. I was extremely careful, because I thought I might fall off the wall. . . . Garrison said, 'I know damn well you can (walk the wall) if you will be careful.' Him being the boss—and I seen him walk it and others walk it, but I never did, I had no business walking it. . . . I thought he knew what he was talking about—a man walking single handed, like I seen people walk over it, I never seen any one walking over it carrying anything —that is different than carrying a load on your shoulder. . . . Q. As you walked across that wall you kept your eyes right on the top of the wall. Is that right? A. Sure. You couldn't be looking in the road or field. Q. You watched every step you took? A. Yes. Q. You saw the condition of the wall as you went across? A. Yes. Q. Then after you got the coal you came right back over that same walk (wall)? A. Started back; yes. Q. Started back. And as you walked then before you took each step you looked? A. Exactly; yes. Q. You had your eyes on the wall where you were stepping? A. Sure. Q. You saw fully and realized fully the condition of the walk (wall)? A. ▮ Absolutely.'' In rebuttal plaintiff testified that the cap at the place from which he fell was not broken, but was cracked and chipped.

Foreman Garrison was called as a witness for plaintiff, but was not called until rebuttal. The sum total of his evidence on direct examination follows: ''Q. Limiting this matter strictly to rebuttal,

I want to ask you just about two matters. I want you to tell the jury whether on the day this man was injured on this wall whether or not any coal or wood or fuel had been provided there for the use of this stove? A. No, sir; there had not been any. Q. And I want to ask you whether or not at the time you were said to have sent this man up on this wall whether or not you knew of any path on the east side of that wall leading from the north end over to the railroad tracks that was dry or that this man might have walked on? A. There wasn't any such path there.'' There was no cross-examination of consequence.

Plaintiff's witness, Smith, testified that he had walked the wall, but he does not say when, or under what conditions. Plaintiff's witness, Grace, testified that he had walked the wall two or three times, but just when it was is not definite. Also, Grace, on cross-examination and without objection, said: ''I'd consider it a dangerous place with a load, with anything in your hand. I wouldn't tackle it with anything. Of course, a man walking without carrying anything, he can get by, but that would be all.''

As appears, supra, plaintiff had seen his foreman walk the wall, but when, and the conditions existing, do not appear.

Plaintiff's witness, Morgan, testified: ''Q. When you were there and Mr. Russell was working there, did he ever indicate or show any injury or trouble with his feet? A. No, not with his feet; his eye was the only thing wrong with him that I could see.'' Dr. Mueller, plaintiff's witness, in his evidence, mentioned the fact that plaintiff had ''lost his left eye.'' It is stated in defendant's brief that plaintiff ''lost one eye in his youth,'' and there is no claim to the contrary.

Defendant testified that there was no scarcity of fuel at the house. Also, defendant's evidence tended to show that there was no mud or soft ground about as plaintiff claimed, and that there was a safe way for plaintiff to have gone to reach the coal. It is not necessary, however, to deal with defendant's evidence in ruling the demurrer to the evidence unless there should be some evidence therein favorable to plaintiff, and such is not the case.

Defendant contends that plaintiff was guilty of contributory negligence as a matter of law. ''If from a consideration of all of the evidence in the case favorable to plaintiff, 'it conclusively appears —that is, appears so convincingly that no reasonable and disinterested minds can rightfully disagree thereover—that plaintiff did not exercise the reasonable and ordinary care which the law requires him to use for the preservation of his own safety,' he is guilty of contributory negligence as a matter of law.'' [Mosely v. Sum et al., 344 Mo. 969, 130 S. W. (2d) 465, l. c. 469, and cases there cited.]

''It is settled law that a 'court should never withdraw a question from the jury, unless ''all reasonable men, in the honest exercise of a fair, impartial judgment, would draw the same conclusion from the

facts which condition the "issue." . . . Where there is .uncertainty arising "from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury." ' " [Courtney v. Ocean Accident & Guaranty Corporation, 346 Mo. 703, 142 S. W. (2d) 858, 1. c. 860; Parrent v. Mobile & Ohio R. Co., 334 Mo. 1202, 70 S. W. (2d) 1068, 1. c. 1073, and cases there cited.]

Plaintiff cites several cases to support the contention that he was not guilty of contributory negligence as a matter of law. Among these is Whittington v. Westport Hotel Operating Co. et al., 326 Mo. 1117, 33 S. W. (2d) 963, and in the brief, counsel asks "the court to compare Mr. Russell's situation with that of the plaintiff" in that case. The plaintiff in that case, a carpenter's helper, fell from a board 8 inches in width. "Plaintiff, on going and returning across the board empty handed, noticed that it was springy and wobbly, and told Gatlin, his boss, that he did not think it was very safe. Gatlin ordered him to carry a wooden trestle or sawhorse, weighing forty to fifty pounds, over the board, telling him to hurry up, that he was needing the material, saying, 'The board is all right;. go ahead.' Plaintiff did not pay particular attention to the board or make an inspection. . . . On crossing over and back prior to his fall, he noticed the board spring down to the beam and did not consider it very safe, but he had no difficulty or trouble in crossing on it and believed he could use it safely by being careful. Plaintiff said, 'I did not think the board was very safe, but I thought if I was extremely careful I could get across there.' He testified that it was light and he could see the situation before him, and that, in crossing when he fell, he was extremely careful, more careful than ordinarily, because of the narrow board."

Assuming, without deciding, that what the foreman said to plaintiff about walking the wall amounted to an assurance of safety, such assurance would not justify plaintiff's attempt to walk the wall with the 70 or 75 pound sack of coal on his shoulder, if to do so was so obviously and glaringly dangerous that a reasonably careful person, in the exercise of ordinary care, would not make such attempt. [Rouchine v. Gamble Construction Co., 338 Mo. 123, 89 S. W. (2d) 58, 1. c. 62, and cases there cited.] "An assurance of safety to the servant cannot be allowed to control his action as to that which is patently open to his observation. [Slagel v. Chas. H. Nold Lumber Co., 138 Mo. App. 432, 1. c. 435, 122 S. W. 321.]

In the Whittington case, it was held that contributory negligence was for the jury. The court said [33 S. W. (2d) 1. c. 968]: "It was negligence to furnish a warped and cupped board, liable to tilt. It is true that plaintiff knew that the board was springy, and he probably knew that it was unfastened and loose, with the ends on the concrete floor, but he did not know that the board was warped and cupped and

liable to tilt. That plaintiff may not be charged with a knowledge of danger so glaring and obvious as to prevent a recovery as a matter of law is accentuated by the testimony of Gatlin that, previous to plaintiff's falling, he had walked over the board several times in accomplishing his work. . . . Whether the danger of traversing the board was so obvious and glaring as to preclude a man of ordinary care and prudence from using it was an open question, especially as Gatlin crossed on the board several times and assured plaintiff of its safety.''

Clearly, we think, the facts in the Whittington case were much more favorable to recovery than are the facts in the present case. In that case the foreman was present and knew the condition of the board, had walked it himself, and plaintiff had walked it. Also in that case, plaintiff did not know the condition of the board. In the present case, the foreman was not present, and so far as appears, did not know the condition of the top of the wall from which plaintiff fell, but plaintiff did know its condition. Also, it appears that only a few days before he had three ribs fractured. Also, according to plaintiff, it was a drizzly day, hence the top of the wall was wet, and he had a 70 or 75 pound sack of coal on his shoulder, and the inference is that plaintiff had but one eye. Also, the wall top was only 8 or 9 inches in width and in places the *cap* was broken and at these places there were depressions from an inch and a half to two inches deep. And there was gravel on the wall, or something that caused plaintiff's foot to roll. All these conditions were known to plaintiff. Neither the Whittington case, nor any other case, in our opinion, supports the contention that plaintiff was not guilty of contributory negligence as a matter of law.

A review of cases is not necessary. In principle, we think that the present case, on the question of contributory negligence, is comparable to Penny v. Southeastern Express Co. (Mo. App.), 35 S. W. (2d) 940. In that case the plaintiff's foreman directed him, while he, plaintiff, was standing immediately behind a calf and had already been kicked by the calf, to twist the calf's tail. He did so; got kicked again and was injured. It was held that he was guilty of contributory negligence as a matter of law, notwithstanding the foreman's direction and assurance that the calf would not hurt him and that it would be perfectly safe to twist its tail.

Defendant contends that plaintiff assumed the risk of walking the wall, but it will not be necessary to consider other questions. Plaintiff was seriously injured, but as we see it, there is no escape from the conclusion that plaintiff was guilty of contributory negligence as a matter of law, and we so rule.

The judgment should be reversed, and it is so ordered. *Hyde* and *Dalton, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.