**Vandal L. DALBY, Appellant,**

**v.**

**HERCULES, INC., Respondent.**

**No. 54046.**

Supreme Court of Missouri, Division No. 2.

Oct. 12, 1970.

William H. Sanders, David C. Trowbridge, Kansas City, for appellant, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, of counsel.

Lane D. Bauer, C. Patrick McLarney, Ross T. Roberts, Kansas City, John W. Scott, Grant W. Scott, Joplin, for respondent, Shook, Hardy, Ottman, Mitchell & Bacon, Kansas City, of counsel.

DREW W. LUTEN, Jr., Special Judge.

Plaintiff, then 35 years of age, received indisputably severe and disabling electrical

burns and injuries on November 9, 1965, while blasting rock from the basement excavation for a house, when the wires, which ran from a dynamite charge to a truck battery providing the electrical power source to detonate the charge, were thrown into the air and against a high tension power line. He brought this suit against defendant, claiming damages of $400,000.00, and, following an adverse verdict and judgment, took this appeal.

All of the evidence as to how plaintiff's injury occurred was adduced by plaintiff, and is without substantial conflict. All facts herein referred to were developed in the evidence offered by plaintiff, except as otherwise noted.

The site of the occurrence was a farm of one Bill N. Glenn, some 10 miles northwest of Sedalia, on the south side of a county gravel road which ran in a general easterly and westerly direction. The excavation for the basement was some 80 feet south of the gravel road, and had been dug into earth some 6 feet deep, at which depth the rock was encountered. Between the north edge of the excavation and the south side of the gravel road, some 40 feet north of the excavation and parallel to the gravel road were high tension power lines of the Central Missouri Electric Cooperative, the top wire of which was approximately 23 feet above the ground level, and the lower wire was some 3 to 4 feet below the top one. Those power lines, and the poles supporting them, were open, obvious and plainly visible. Some 40 feet south of the excavation was a shed, and some 80 feet south and somewhat east of the excavation was an old barn. There was a dirt lane or driveway which ran westwardly from this farm to a point west of the excavation, and then turned north and ran to the gravel road. West of this lane or driveway, and some 40 to 60 feet west and slightly south of the excavation, was another shed.

On the morning of his injury, which was a clear "sunshiny" day, plaintiff was instructed by his boss, Mr. James W. Atkinson, who owned and operated the Atkinson

Construction Company, to go to the Glenn farm and blast the rock from the basement excavation. The only instructions given by Mr. Atkinson to plaintiff consisted of a small diagram showing how much rock was to come out of the different parts of the surveyed excavation, and the details of the work were left up to the plaintiff. In order to do the work, plaintiff required blasting caps, wire and dynamite.

An electrical blasting cap consists of a metal shell containing a charge of ignitable powder through which runs a small piece of high resistance wire connected at each end with an insulated wire, which insulated wires are known as "cap wires." When electrical current is passed through the cap wires to the resistance wire, that wire heats and ignites the powder, causing an explosion of the cap which, if inserted in a stick of dynamite, detonates the dynamite. Cap wires come in various lengths, but are relatively short, and, in blasting operations, are connected to the source of electrical current by longer insulated wires known as a "firing line."

Plaintiff, who was in charge of the blasting job, obtained from the construction company shop a box of electrical blasting caps, having 6 foot cap wires and manufactured by defendant, and he and another Atkinson employee, Orville Lane, who was to do the drilling, took one of the construction company's trucks, towing a compressor, to be used for drilling, to get to the Glenn farm. However, plaintiff first drove the truck to a hardware store in Sedalia, where he purchased a half case of dynamite, manufactured by defendant, and a 500 foot spool of two wire braided, insulated firing line wire.

Upon arriving at the Glenn farm, plaintiff drove the truck and compressor into the lane or driveway and to a point some 30 feet south of the excavation, and there detached the compressor and left it. He then unloaded his dynamite and put it behind (west of) one corner of the shed which stood to the west of the excavation, and put the blasting caps behind the other

corner of that same shed. He then drove the truck out onto the gravel road to a point north of the excavation, and parked it on the south shoulder of the road there, facing west. Meanwhile, Mr. Lane had run his air hose for the drill from the compressor down into the excavation, and plaintiff directed Mr. Lane where to drill, and Mr. Lane proceeded to do the drilling of three holes, some 24 to 30 inches deep, in the rock in the excavation.

Plaintiff then went back to the shed behind which he had put the dynamite, and read through a pamphlet of instructions enclosed by defendant in every case of dynamite and box of blasting caps produced by it, and which plaintiff had received with the dynamite which he had purchased earlier that morning at the hardware store. That pamphlet of instructions was entitled "Prevention of Accidents in the Use of Explosives, Approved by the Institute of Makers of Explosives, February 1, 1964." That Institute was a private trade association of manufacturers of explosives, one of the functions of which was to cooperate with various governmental agencies, organizations of users of explosives, and safety organizations, to promote proper and safe transportation, storage, handling and use of explosives. Beginning about 1955, all of the companies which were members of the Institute and manufactured dynamite inserted a copy of a similar pamphlet, as revised from time to time, in every case of dynamite which they manufactured. The pamphlet began:

"The prevention of accidents in the use of explosives is a result of careful planning and observance of the best known practices. The explosives user must remember that he is dealing with a powerful force and that various devices and methods have been developed to assist him in directing this force. He should realize that this force, if misdirected, may either kill or injure both him and his fellow workers.

"WARNING: All explosives are dangerous and must be handled and used with care either by or under the direction of competent experienced persons. It is the responsibility of all persons who handle explosives to know and to follow all approved safety procedures.

"It is obviously impossible to include warnings or approved methods for every conceivable situation. A list of suggestions to aid in avoiding the more common causes of accidents is set forth herein. Additional information is available in the Institute of Makers of Explosives publications listed below. Copies of these publications may be obtained by writing the Institute of Makers of Explosives, 420 Lexington Avenue, New York, New York 10017, or from your explosives supplier: * * *."

and it contained more than 70 numbered "Do's and Don'ts" with a reference on its first page, in large letters surrounded by a red ink arrow pointing to the "Do's and Don'ts", reading:

"Read these Do's and Don'ts Carefully."

One of the "Don'ts", included in all the revisions of the pamphlet although bearing a different number in some revisions, stated:

"45. DON'T load any bore holes near electric power lines unless the firing line, including the electric blasting cap wires, is so short that it cannot reach the power lines."

After reading the pamphlet, plaintiff "primed", by attaching blasting caps to sticks of dynamite as prescribed in the pamphlet, three sticks of dynamite, by which time Mr. Lane had completed the drilling of three holes, and plaintiff then "loaded" those holes by placing in each of them one of the three primed sticks of dynamite, tamping dirt and dust from the drilling into the holes on top of the dynamite, and packing clay on top of that. He then connected together in series the blasting cap wires leading from the three loaded holes, after which he connected the two loose ends of the cap wires to his firing line, some 100 to 150 feet of which, either

just before or just after loading the holes, he had unrolled and cut from the spool and strung between the south side of the excavation and the truck. The connections between the cap wires and the firing line wires were made by twisting together bare ends of the respective wires.

After plaintiff had connected the firing line wires to the blasting wires in the excavation, he and Mr. Lane walked to the north side of the truck, where plaintiff, after taking the insulation off about an inch of the ends of the firing line wires, touched the bare ends of the firing line wires to the terminals on the truck battery, which was located next to the cowl under the hood on the right side of the truck, thereby causing the dynamite to explode. The blast caused rock, dirt and other debris to fly up in the air, some rock chips and pieces as large as a man's fist, if not larger, being thrown as far as 130 feet north of the excavation.

A second blast was then carried out, similar to the first, except that it involved five or six drilled holes and sticks of dynamite, instead of three, and except that the firing line, having been strung from the excavation to the truck for the first blast, was not replaced with a new length of wire. The results of this second blast were similar to the earlier one.

Preparations were then made for a third blast, and those were carried out as with respect to the second blast, and, up to the point where the explosion of the dynamite occurred, everything was as with the second blast. On this third blast, when the explosion of the dynamite took place, the firing line, either with or without the cap wires, was blown up into the air and into contact with the high voltage power lines, there was a large flash of light like lightning and fire which came out from near the battery under the hood of the truck, and an arcing at the overhead power line, and Mr. Lane observed plaintiff standing "stiff as a board." Mr. Lane grabbed plaintiff around the waist, and Mr. Lane was knocked down by electric shock, but

got up, and, by pulling on plaintiff's suspenders, jerked plaintiff away from whatever was charged with electricity from the power line, the two men falling to the ground together. Plaintiff was then taken to a hospital for treatment of his injuries.

Mr. Atkinson's testimony by deposition read during the course of defendant's evidence, was to the effect that, later in the afternoon of the day of plaintiff's injury, he had gone to the Glenn farm, was there advised of what had occurred, found that the firing line had catapulted into the power line, leaving the end of a piece of the firing line hooked over the power line, which piece of firing line he dislodged with a long wooden handle.

A few days after plaintiff's injury, his father, William E. Dalby, and Mr. Lane finished the blasting work at the excavation. On that occasion, the truck was parked at the northwest corner of the barn on the Glenn farm, and the firing line was strung southwardly from the excavation to the truck.

There is no contention by plaintiff that the dynamite or blasting caps manufactured by defendant were in any way defective, or that he was injured by them. Plaintiff contends that defendant was negligent in failing to give him adequate warning of the hazard of a firing line being thrown up into the air and against overhead high tension power lines by the explosion of dynamite during blasting operations, and here asserts error in an instruction on contributory negligence given at defendant's request. In our view of this case, neither of these issues need be reached, nor determined, because, from a careful consideration of the record, we have reached the conclusion that the question of plaintiff's contributory negligence is the decisive issue.

■ Everyone has the duty to exercise due care for his own safety, as well as the safety of others, and he should not expect someone else to compensate him for his injuries when he does not do so. In deter-

mining the question of whether plaintiff was contributorily negligent as a matter of law, we bear in mind that plaintiff's negligence is a jury question, unless it may be said from all the evidence, viewed in the light most favorable to plaintiff, that it appears so convincingly that no reasonable and disinterested minds can rightfully disagree that plaintiff failed to exercise due care for his own safety and was negligent, and that his negligence was a proximate cause of his injury (Brooks v. Stewart, Mo., 335 S.W.2d 104, 109–110; Adkins v. Boss, Mo., 290 S.W.2d 139, 140; Russell v. Johnson, 349 Mo. 267, 160 S.W.2d 701, 704). In making such a determination, each case must be considered in the light of its own peculiar facts and circumstances (Moore v. Eden, Mo., 405 S.W.2d 910, 916; Creech v. Riss & Co., Mo., 285 S.W.2d 554, 559; Shaffer v. Sunray Mid-Continent Oil Co., Mo., 336 S.W.2d 102, 107).

■ The plaintiff, while having quit school shortly after completing the eighth grade and being without formal education respecting explosives, was a competent and experienced person in the handling of explosives, including dynamite, and he testified that he so considered himself. As a young boy on the farm in Iowa, he had observed blasting in quarries in the area, and knew from those observations that the blasting there was done with dynamite and electric blasting caps. When he was in the Army in Germany, in his late teens and early twenties, he received instruction, and took part, in demolition by the use of TNT detonated by blasting caps and fuse. After he first went to work for Mr. Atkinson, he gained experience in blasting work from watching and assisting his father and other of Mr. Atkinson's employees, and for 10 or more years before his injury he frequently did blasting in the regular course of his employment by Mr. Atkinson, using dynamite and electric blasting caps.

Plaintiff concededly knew, as was stated in the pamphlet hereinbefore referred to, that one dealing with explosives was dealing with a force which, if misdirected, could kill him or others. He knew, from the time he was a boy in Iowa, that rocks, dirt and other matter were thrown up into the air by the discharge of dynamite in blasting operations. While he categorically denied that he was aware, prior to his injury, of the hazard of a firing line wire being catapulted into overhead power lines, his denial manifestly was based upon his testimony that he had never seen a firing line catapulted into the air by a blast, for, on at least two occasions during his cross-examination, he stated that he had testified on deposition that he anticipated the possibility that something—rock, or a firing line, or anything that might be loose— might fly up into the air from the explosions of the dynamite he was using in the blasting in the excavation, and that such testimony at his deposition was true. Plaintiff knew of no reason why a firing line would not, like rock and other material, be thrown up into the air as the result of a dynamite blast.

Plaintiff also knew that high power lines carry high voltages of electricity, and any contact with them was extremely dangerous and hazardous, and, consequently, he said he would never take a chance of either coming in contact with them personally, or having a wire that was in his hand do so.

Plaintiff also testified that not only had he read on the morning of his injury the pamphlet he received when he purchased the dynamite, but he had previously on several occasions read the pamphlet or earlier editions of it. He testified that Don't No. 45 meant to him that one doing blasting should be sure that his *cap wires* should not reach a power line *while he was loading the bore hole*, that *it applied only while the bore hole was being loaded*, that *it applied only to the cap wires* and that it *did not apply to the firing line* because the firing line is not connected up while a bore hole is being loaded. His interpretation of the Don't is unacceptable. That Don't clearly reads:

"Don't load any bore holes near electric power lines, *unless the firing line,*

including the electric blasting cap wires, *is so short that it cannot reach the power lines."* (Emphasis supplied.)

That Don't obviously referred to the firing line as its primary subject, which line is necessarily of considerable length, and referred only secondarily to cap wires, which are relatively short (in this instance only 6 feet long as compared to some 150 feet of firing line), as an extension of the firing line. To attribute to that Don't the meaning for which plaintiff claims would be not only to ignore its plain language and its obvious purpose to prevent contact between a firing line and power lines, but to ignore the indisputable facts that the only wires involved in the drilling and loading process were the cap wires which were only 6 feet long, were partially buried in the loaded bore holes, and could not reach to the level of the top of the excavation, much less to overhead power lines. Plaintiff here is in the same position as was plaintiff in Borowicz v. Chicago Mastic Co., 7 Cir., 367 F.2d 751, 756, where, in holding that plaintiff was contributorily negligent for not following instructions on a label, his understanding of which was contrary to the meaning of the words used, it was said:

"'Plaintiff had read this label at least eight times previously and it needs to be read as a whole. He may not now lift certain words or phrases out of the context of that familiar label, and thereby seek to impose liability on the manufacturer for injuries occasioned by his own negligence.'"

Plaintiff knew, without ever having read Don't No. 45, that electric power lines were a source of danger and hazardous, and Don't 45 specifically pointed to them as such. The power lines here involved, and the poles supporting them, were open and obvious, but plaintiff said that he did not see either those lines or poles, never even looked for them, and would have proceeded with his blasting work as he did had he known of their presence, because he never concerned himself with power lines unless a pole supporting them was so close

to the blasting that it would be likely to be caused to fall over. He had a duty to look, and to look was to see what was plainly apparent had he looked (Hamilton v. Laclede Electric Cooperative, Mo., 294 S.W.2d 11, 17; Branscum v. Glaser, Mo., 234 S.W.2d 626, 627; Burroughs v. Union Electric Company, Mo.App., 366 S.W.2d 69, 74; Bryan v. Sweeney, 363 Mo. 1024, 256 S.W.2d 769, 774), so that, in the eyes of the law, he knew of the existence and location of the power lines. Plaintiff testified, further, that he knew of no reason why he could not have parked the truck to the south of the excavation, instead of to the north of it as he did, in order to perform the blasting work to be done.

Furthermore, Mr. Lane testified, for plaintiff, that plaintiff placed a rock on the firing line at the top of the north bank of the excavation when plaintiff strung the firing line before the first blast. Plaintiff did not recall doing that, but said that, if he did it, his only purpose was to keep from separating the firing wires from the cap wires where they were connected together, by tension being put upon the connections while he was stringing out his firing line, as he *never* placed rocks or anything else on a firing line to anchor it to the ground.

Plaintiff was, and he knew he was, dealing with an imminently and inherently dangerous instrumentality. Don't No. 45 plainly directed his attention to the dangers of contact between a firing line and overhead power lines, and directed that the firing line be kept "so short that it cannot reach the power lines."

Plaintiff not only failed to follow that Don't, but he failed to discover—in fact ignored—the presence of the power lines, and failed to take any precaution to avoid contact between his firing line and the power lines. Had he followed Don't No. 45, or had he parked his truck to the south of the basement excavation as his father later did when he finished the blasting work, or had he anchored his firing line to the

ground by some means, he could not have been injured in the manner in which he was injured. That he failed to exercise ordinary care under the circumstances is a fact about which there is no room for reasonable and disinterested minds to differ.

Plaintiff leans heavily upon the decision in Bean v. Ross Manufacturing Co., Mo., 344 S.W.2d 18, to support his contention that he was not contributorily negligent. The facts of that case differentiate it from the case at bar. The product there in use was not in itself an imminently and inherently dangerous explosive, as was the dynamite here, and the plaintiff's knowledge of the hazard involved was not there, as it was here, established by his general background and experience.

The only conclusion we can reach is that plaintiff was negligent and that his negligence directly contributed to his injury. We hold that plaintiff cannot recover because his own evidence shows contributory negligence as a matter of law. (Hamilton v. Laclede Electric Cooperative, Mo., 294 S.W.2d 11, 15; Frandeka v. St. Louis Public Service Co., 361 Mo. 245, 234 S.W.2d 540, 547; Scott v. Kurn, 343 Mo. 1210, 126 S.W.2d 185, 187.)

The judgment is affirmed.

MORGAN, Acting P. J., and FINCH, J., concur.

DONNELLY, P. J., not sitting.