Betty CROW, et al., Appellant,

v.

KANSAS CITY POWER &
LIGHT COMPANY, et
al., Defendants,

Crico of Ethans II and Equity Residential Properties Management Corp.; Mayfield Enterprises, Respondents.

No. WD 64229.

Missouri Court of Appeals,
Western District.

July 5, 2005.

Application for Rehearing and/or Transfer to Supreme Court Denied Aug. 30, 2005.

Application for Transfer Denied
Nov. 22, 2005.

Paul P. Hasty, Jr., Overland Park, KS, for respondents Crico and Equity.

Kelly Warren, Overland Park, KS, for respondent Mayfield.

Before ROBERT G. ULRICH, Presiding Judge, JAMES M. SMART, JR., Judge and JOSEPH M. ELLIS, Judge.

JOSEPH M. ELLIS, Judge.

Betty Crow, John Dority, and Nevada Dority ("Appellants") are, respectively, the mother and emancipated natural children of John Dority ("Dority"), who died after an uninsulated aluminum ladder he was moving came in contact with an uninsulated 7,000–volt overhead electric power line while he was performing daytime painting work on Unit 9 of an apartment complex known as The Ethans, located at 8300 North Hickory in Kansas City, Missouri. At the time of the accident, which occurred on August 14, 2000, the power line in question was maintained by Defendant Kansas City Power & Light Company ("KCP & L"). Respondent Crico of Ethans II, L.P. ("Crico") owned The Ethans, and Respondent Equity Residential Properties Management Corporation ("Equity Residential") managed the apartment complex for Crico. Dority's employer was Respondent Mayfield Enterprises, a sole proprietorship owned and operated by Jay Mayfield ("Mayfield").

On June 7, 2002, Appellants filed a wrongful death suit against KCP & L, Crico, Equity Residential, Mayfield, and Mayfield Enterprises, alleging that they were all negligent and that their negligence caused or contributed to cause Dority's wrongful death from electrocution. Appellants subsequently settled their claims against KCP & L in exchange for a payment of $210,000, but continued to pursue their claims against the remaining defendants. On June 26, 2003, Mayfield En-

Brian F. McCallister, Kansas City, MO, for appellants.

terprises moved for dismissal of all claims against it for lack of subject matter jurisdiction, asserting that since Appellants' claims arose out of Dority's on-the-job injuries, Mayfield Enterprises was immune from civil liability to Appellants for Dority's alleged wrongful death under the exclusive jurisdiction provisions of Chapter 287, The Workers' Compensation Law ("WCL").[1] The same day, Crico and Equity Residential moved for summary judgment against Appellants on the basis that they had no duty to eliminate or warn Dority of the danger posed by the overhead power lines located near Unit 9 of The Ethans apartment complex since it was open and obvious as a matter of law. After exhaustive briefing by both parties, the circuit court ultimately granted both motions, leading to this appeal.[2]

In their first point, Appellants argue that the trial court abused its discretion in granting Mayfield Enterprises' motion to dismiss for lack of subject matter jurisdiction because certain affirmatively negligent acts alleged to have been performed by Mayfield created an exception to the exclusivity provisions of the WCL and because there is also a statutory exception to the exclusive remedy and jurisdiction provisions of the WCL when an employer is alleged to have violated provisions of the Overhead Power Line Safety Act, ("OPLSA"), §§ 319.075—319.090.

■ Section 287.120 governs the determination of when an injury falls under the WCL. In pertinent part, it states:

1. Every employer subject to the provisions of this chapter shall be liable, irrespective of negligence, to furnish compensation under the provisions of this chapter for personal injury or death of the employee by accident arising out of and in the course of his employment, and shall be released from all other liability therefore whatsoever, whether to the employee or any other person. . . .

2. The rights and remedies herein granted to an employee shall exclude all other rights and remedies of the employee, his wife, her husband, parents, personal representatives, dependents, heirs or next kin, at common law or otherwise, on account of such accidental injury or death, except such rights and remedies as are not provided for by this chapter.

*Id.* The Missouri Supreme Court has held that the WCL was not supplemental or declaratory of any existing rule, right or remedy, but created an entirely new right or remedy which is "wholly substitutional in character and supplants all other rights and remedies, at common law or otherwise." *Marie v. Standard Steel Works,* 319 S.W.2d 871, 875 (Mo. banc 1959). It provides the exclusive remedy for employees against employers for injuries covered by its provisions, and subject matter jurisdiction over such matters properly lies only in the Labor and Industrial Relations Commission. *State ex rel. Taylor v. Wallace,* 73 S.W.3d 620, 621 (Mo. banc 2002). Accordingly, "[a] motion to dismiss for lack of subject matter jurisdiction is the proper method to raise as a defense to a tort action the exclusive jurisdiction of the Workers' Compensation Law, as provided in Chapter 287." *Sexton v. Jenkins & Assocs., Inc.,* 41 S.W.3d 1, 3 (Mo.App. W.D.2000).

1. All statutory references are to RSMo 2000.

2. Respondents Crico and Equity Residential moved for dismissal of Appellants' appeal alleging failure to comply with Rule 84.04(c), which requires the statement of facts in briefs to "be a fair and concise statement of facts relevant to the questions presented for determination without argument." This request is denied.

"In determining the question of its subject matter jurisdiction, the circuit court is not only the arbiter of the law, but the facts necessary to decide the question." *Kesterson v. Wallut,* 116 S.W.3d 590, 594 (Mo.App. W.D.2003). Thus, whether the subject matter of an action falls within the exclusive jurisdiction of the Labor and Industrial Relations Commission is a question of fact, resolution of which is left to the sound discretion of the trial court. *Burns v. Employer Health Servs., Inc.,* 976 S.W.2d 639, 641 (Mo.App. W.D.1998). Its decision on this question may be "based not only on facts appearing of record, but facts adduced by affidavits of the parties, oral testimony, and depositions." *Kesterson,* 116 S.W.3d at 595.

"Dismissal for lack of subject-matter jurisdiction is proper whenever it appears, by suggestion of the parties or otherwise, that the court is without jurisdiction." *Mo. Soybean Ass'n v. Mo. Clean Water Comm'n,* 102 S.W.3d 10, 22 (Mo. banc 2003); *Rule 55.27(g)(3).* "As the term 'appears' [in Rule 55.27(g)(3) ] suggests, the quantum of proof is not high; it must appear by the preponderance of the evidence that the court is without jurisdiction." *James v. Poppa,* 85 S.W.3d 8, 9 (Mo. banc 2002). As applied here, then, if it appears to the trial court by a preponderance of the evidence before it that "the employer, the employee and the accident fall under the Workers' Compensation Law, the case is cognizable by the Labor and Industrial Relations Commission and the Commission's jurisdiction is original and exclusive." *State ex rel. J.E. Jones Constr. Co. v. Sanders,* 875 S.W.2d 154, 156 (Mo.App. E.D.1994). This "may limit a particular individual's recovery, but it ensures that more individuals enjoy the protection intended by the Workers' Compensation Law." *Vatterott v. Hammerts*

*Iron Works, Inc.,* 968 S.W.2d 120, 121 (Mo. banc 1998).

Where, as here, the facts bearing on the issue are contested, we review the trial court's decision on a motion to dismiss for lack of subject matter jurisdiction for abuse of discretion, *Mo. Soybean Ass'n,* 102 S.W.3d at 22, rather than under the summary judgment standard. *Jones,* 875 S.W.2d at 157. Judicial discretion is abused only where " 'the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable people can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.' " *Newman v. Ford Motor Co.,* 975 S.W.2d 147, 151 (Mo. banc 1998) (quoting *Richardson v. State Highway & Transp. Comm'n,* 863 S.W.2d 876, 881 (Mo. banc 1993)).

The evidence presented to the trial court on the issue of its subject matter jurisdiction over Appellants' wrongful death claims against Mayfield and Mayfield Enterprises included the following. At the time of the accident, Dority was a full-time employee of Mayfield Enterprises, a Missouri employer subject to the WCL which has been in the business of providing painting services for nearly twenty years. Dority had worked for Mayfield Enterprises for approximately two and a half years and was acting within the course and scope of his employment when the uninsulated aluminum ladder he was carrying came into contact with the overhead power lines in question, which were located approximately fifteen to twenty feet from the rear of Unit 9 of The Ethans apartment complex and were first placed there by KCP & L in March 1989. Mayfield did not know the overhead power lines in question were

present until after Dority had been electrocuted, and neither Crico nor Equity Residential had notified Mayfield that overhead power lines were present on the property comprising The Ethans prior to Dority's electrocution. At the time of the accident, Mayfield was not at the work site. Dority, and only Dority, had his hands on the ladder, and he received no assistance with the ladder from anyone. The accident occurred when Dority was walking around to the rear of Unit 9, lost his balance while evidently carrying the ladder in a vertical, upright position, "and somehow backed up and got into the lines." Dority's family filed a claim for death benefits under the WCL, and that claim has already been paid.

■ On these facts, it is abundantly clear that the trial court did not abuse its discretion in concluding that it lacked subject matter jurisdiction over Appellants' wrongful death claims against Mayfield and Mayfield Enterprises. Appellants nevertheless contend that inasmuch as they alleged that Mayfield committed several "affirmative negligent acts" outside the scope of his responsibility to provide Dority a safe workplace, neither Mayfield nor Mayfield Enterprises were immune from tort liability under the WCL and the trial court had jurisdiction over the subject matter of their wrongful death suit against those defendants. In particular, they point to their first amended petition, in which they alleged that Mayfield: (1) "intentionally and/or consciously" failed to provide Dority with an insulated ladder to conduct his work-related duties; (2) failed to provide Dority with proper safety training and instruction in connection with working around overhead power lines; (3) failed to warn Dority of the risk of danger associated with working around overhead power lines; (4) "intentionally and/or consciously directed and/or ordered" Dority to work around overhead power lines when Mayfield "knew, could and/or should have known" of the existence of the lines in question and the danger they presented; (5) failed to properly inspect the work site where Dority was to perform his work-related duties; (6) "intentionally and/or consciously" provided Dority with an uninsulated ladder and "directed and/or ordered that he use" such a ladder to perform his work-related duties when Mayfield "knew, could and/or should have known" of the risk of danger associated with the use of such a ladder around overhead power lines; and (7) "intentionally and/or consciously failed to turn off, or arrange to have turned off," the power to the overhead power lines in question when Mayfield "knew, could and/or should have known" of the risk of danger associated with the use of an uninsulated ladder around such lines.

■ Under the circumstances here, however, these allegations, artfully drafted as they may have been, were insufficient to confer subject matter jurisdiction on the trial court. Considered collectively and in conjunction with the facts recited *supra*, which clearly negate all of Appellants' conclusory claims to the effect that Mayfield or Mayfield Enterprises acted with the specific purpose to injure or affirmatively increase the risk of danger to Dority, they amount to nothing more than the allegation that Dority's employer negligently failed to discharge its non-delegable duty to provide Dority a safe workplace. This is not enough to move an employer outside the protection of the WCL's exclusive remedy provisions because, although an employer has a nondelegable duty to provide its employees with a reasonably safe place to work, separate circuit court actions for breach of that duty are excluded by the WCL. *Kelley v. DeKalb Energy Co.*, 865 S.W.2d 670, 672 (Mo. banc 1993). That is

to say, "[a]n employee injured performing his work duties and sustaining his injuries because the workplace was unsafe has no common law suit against either the employer or the employer's agent, but is relegated to the benefits provided under the Workers' Compensation Law." *Gabler v. McColl,* 863 S.W.2d 340, 343 (Mo.App. E.D.1993). Based on the record before us, Appellants' claims fall directly within the purview of the WCL, thereby depriving the trial court of subject matter jurisdiction over their suit against Mayfield and Mayfield Enterprises.

Seeking to avoid this result, Appellants argue, in the alternative, that the trial court had jurisdiction over the subject matter of their wrongful death suit against Mayfield and Mayfield Enterprises inasmuch as their petition also expressly alleged that Mayfield had committed numerous violations of the OPLSA, including, *inter alia,* failing to notify KCP & L that his employees would be working around the overhead power lines in question and failing to make any temporary electrical safety arrangements with KCP & L before commencing the painting work on Unit 9 of The Ethans.

█ Although it had before it quite a bit of conflicting evidence bearing on the issue, the trial court did not make a finding that Mayfield had or had not violated the OPLSA, or even that he could be found to have violated the OPLSA. Instead, the trial court ruled only that because the statute "does not affect or create an exception to an employer's immunity under the Worker's Compensation Act," recovery under the WCL "is Plaintiff's exclusive remedy against Defendant Mayfield. Jurisdiction properly lies with the Labor and Industrial Relations Commission, not this Court." This ruling, which was a determination of law rather than fact and is reviewed *de novo* on appeal,

*State v. Wiley,* 80 S.W.3d 509, 511–12 (Mo. App. W.D.2002), was entirely correct.

The OPLSA was enacted in 1991. Section 319.083 states:

1. When any person desires to temporarily carry out any function or activity in closer proximity to any high voltage overhead line than is permitted by sections 319.075 to 319.090, the person or persons responsible for the function or activity shall notify the public utility which owns or operates the high voltage overhead line of the function or activity, and shall make appropriate arrangements with the public utility for temporary mechanical barriers, temporary deenergization and grounding of the conductors, temporary rerouting of electric current or temporary relocating of the conductors, before proceeding with any function or activity which would impair the clearances required by sections 319.075 to 319.090.

2. A person requesting a public utility to provide temporary clearances or other safety precautions shall be responsible for payment of those costs incurred by such utility in the temporary rerouting of electric current or the temporary relocating of the conductors. Upon request, a public utility shall provide a written cost estimate for the work needed to provide temporary clearances or other safety precautions. A public utility is not required to provide such clearances or other safety precautions until payment of the estimated amount has been made. Unless otherwise agreed to, a public utility shall commence work on such clearances or other safety precautions within seven working days after payment has been made.

Section 319.080 provides:

Unless danger against contact with high voltage overhead lines has been guarded against as provided by section 319.083,

no person, individually or through an agent or employee, shall store, operate, erect, maintain, move or transport any tools, machinery, equipment, supplies or materials or any other device that conducts electricity, within ten feet of any high voltage overhead line, or perform or require any other person to perform any function or activity upon any land, building, highway or other premises, if at any time during the performance thereof it could reasonably be expected that the person performing the function or activity could move or be placed within ten feet of any high voltage overhead line.

Moreover, according to section 319.085:

If a violation of any of the provisions of sections 319.075 to 319.090 results in physical or electrical contact with any high voltage overhead line such violation shall be a rebuttable presumption of negligence on the part of the violator in the event such violation shall cause injury, loss or damage, and, notwithstanding any other law to the contrary, the public utility shall have the right of contribution against any such violator. In addition to any penalties provided herein, liability under common law may apply.

Finally, section 319.090 provides that "[a]ny person who violates any of the provisions of sections 319.075 to 319.088 is guilty of a class B misdemeanor."

Appellants argue that Mayfield's alleged violation of the OPLSA constitutes a statutory exception to the exclusive jurisdiction of the WCL. In support of this argument, they rely on *State ex rel. Safety Roofing Systems, Inc. v. Crawford*, 86 S.W.3d 488 (Mo.App. S.D.2002).

In *Safety Roofing*, an employee was injured on the job when a piece of metal trim he was handling came into contact with a high-voltage overhead power line. 86 S.W.3d at 490. After filing and settling a workers' compensation claim against his employer, the injured employee sued the city that owned and operated the power line in circuit court, claiming that the city's negligence resulted in his personal injuries. *Id.* The city then filed a third-party petition, seeking contribution from the injured worker's employer for any recovery the worker might ultimately obtain in his tort claim against the city under section 319.085 of the OPLSA. *Id.* The city's contribution claim was based solely on the allegation that the employer breached its duty, under section 319.083, to notify and make appropriate electrical safety arrangements with the city before putting its employee to work within ten feet of the city's overhead power line. *Id.* The employer moved to dismiss the city's third-party petition due to lack of subject matter jurisdiction, contending that the city's claim for contribution was barred by the WCL's exclusivity provisions. *Id.* The circuit court overruled the motion, and the employer sought a writ prohibiting the court from trying the city's third-party contribution claim against the employer. *Id.* After conducting a review of prior Missouri case law, as well as that from other state courts considering statutes similar to the OPLSA, the Southern District concluded that, in light of the specific language of section 319.085, which expressly provides that "notwithstanding any other law to the contrary, the public utility shall have the right of contribution against any such violator," the "legislature intended the contribution provisions of the OPLSA as exceptions to the exclusivity provisions of the WCL." *Id.* at 493. Accordingly, the Southern District quashed its preliminary writ of prohibition and held that section 319.085 of the OPLSA authorized the city to seek contribution from the injured worker's employer based on the city's allegation that the employer violated its independent stat-

utory duty to notify the city that its employees would be working within ten feet or less of the city's high-voltage, overhead power lines. *Id.* at 493–94.

It is readily apparent that *Safety Roofing* is inapposite, because it involved a contribution claim against an injured worker's employer brought by a third-party non-employer who had been sued by the injured employer outside the strictures of the WCL. Here, however, we are not dealing with a third-party claim for contribution by KCP & L against Mayfield or Mayfield Enterprises. In any event, *Safety Roofing* certainly does *not* hold, as claimed by Appellants, that "[a]n employer can be held liable at common law for an employee's injuries when the employer fails to comply with provisions of the OPLSA." In short, the case is of no benefit to Appellants, as it simply did not address any OPLSA-based exceptions to the exclusive jurisdiction of the WCL vis-à-vis claims by an employee against his or her employer.

Appellants' final argument in support of their first point relied on is based on the last sentence of section 319.085, which, as noted *supra,* states:

> If a violation of any of the provisions of sections 319.075 to 319.090 results in physical or electrical contact with any high voltage overhead line such violation shall be a rebuttable presumption of negligence on the part of the violator in the event such violation shall cause injury, loss or damage, and, notwithstanding any other law to the contrary, the public utility shall have the right of contribution against any such violator. *In addition to any penalties provided herein, liability under common law may apply.*

(emphasis added.) Appellants claim that the final sentence demonstrates the General Assembly's intent to affirmatively authorize an injured worker to seek common-law remedies against his or her employer in circuit court when the worker alleges that his or her injuries were caused by the employer's violation of the OPLSA. We cannot agree.

Our primary objective in interpreting this statute is to give effect to the General Assembly's intent. *State v. Grubb,* 120 S.W.3d 737, 739 (Mo. banc 2003). It is clear that section 319.085 was not intended to apply in cases where an employee who was injured after he or she made physical or electrical contact with a high voltage overhead power line sues his or her employer *directly* in tort, as opposed to suing the non-employer public utility which owned or operated the lines in question. That is to say, the object of section 319.085 is to protect public utilities from having to pay the full measure of common-law damages to those injured or damaged due to another party's failure to carry out its duties, under section 319.083.1, to notify and to make and pay for appropriate temporary electrical safety arrangements with the public utility before proceeding with any function or activity which would impair the ten-foot clearances required by the statute. Section 319.085 accomplishes this legislative objective by establishing a rebuttable presumption of negligence on the part of the violator in favor of the public utility in the event the violation results in injury, loss or damage, by granting the public utility the right of contribution against the violator and by providing that the public utility may also be able to assert other common-law theories of liability against the violator. If the legislature intended to do more than this, it certainly did not speak in clear, certain, and unambiguous terms, as it did in providing, earlier in the same statute, that "notwithstanding any other law to the contrary, the public utility shall have the right of contribution against any such violator." *See*

*Safety Roofing,* 86 S.W.3d at 493 (noting that the legislature "could not have spoken more clearly" in this regard).

 Second, within the framework of the WCL itself, the legislature has already expressly addressed and provided a specific, unambiguous remedy for statutory violations such as those alleged by Appellants. According to section 287.120.4 of the WCL:

> Where the injury is caused by the failure of the employer to comply with any statute in this state or any lawful order of the division or the commission, the compensation and death benefit provided for under this chapter shall be increased fifteen percent.

In order to be awarded the fifteen percent increase under section 287.120.4, "a claimant must demonstrate the existence of the statute or order, its violation, and a causal connection between the violation and the compensated injury." *Akers v. Warson Garden Apts.,* 961 S.W.2d 50, 53 (Mo. banc 1998), *overruled in part on other grounds by Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 224 (Mo. banc 2003). Indeed, our Supreme Court has observed that since section 287.120.4 provides for a mandatory fifteen percent increase in the compensation and death benefit when an employee's work-related injury is shown to have been caused by the failure of his or her employer to comply with any state statute, it ensures that "an employer does not escape liability for violating state statutes," even in cases governed by the WCL. *Id.* at 56.

For these reasons, we hold that Appellants' exclusive remedy against Mayfield and Mayfield Enterprises for their alleged violations of the OPLSA is provided by sections 287.240.1 and 287.120.4. Accordingly, the circuit court did not err in determining that it lacked subject matter jurisdiction to address those claims. Point denied.

In their second point, Appellants argue that the trial court erred in granting summary judgment to Crico and Equity Residential on Appellants' premises liability claims against them because there remained genuine issues of material fact which precluded such a disposition.

 The standard of *review governing* this aspect of Appellants' appeal was summarized in *Wills v. Whitlock,* 139 S.W.3d 643 (Mo.App. W.D.2004):

> A movant is entitled to summary judgment if the motion for summary judgment and the response thereto show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. We view the record in the light most favorable to the party against whom summary judgment is entered and accord the non-movant the benefit of all reasonable inferences from the record. We take as true the facts set forth by affidavit or otherwise in support of the moving party's motion unless they are contradicted by the nonmoving party's response to the summary judgment motion. The non-moving party's response must show the existence of some genuine dispute as to one of the material facts necessary to the plaintiff's right to recover.

*Id.* at 646 (quoting *Butler v. Burlington N. & Santa Fe Ry. Co.,* 119 S.W.3d 620, 621–22 (Mo.App. W.D.2003)). Furthermore, as stated by the Missouri Supreme Court in *Harjoe v. Herz Financial,* 108 S.W.3d 653, 654 (Mo. banc 2003): "Review is *de novo.* Because the trial court makes its decision based upon the record submitted and the law, this Court need not defer to the order of the trial court granting summary judgment." (internal citation omitted). "To succeed on summary judgment, a defen-

dant must show: (1) undisputed facts negating any of plaintiffs' required elements; (2) the plaintiffs, after adequate time for discovery, cannot produce evidence sufficient to find one of plaintiffs' required elements; or (3) there is no genuine dispute as to each fact necessary to support a properly-pleaded affirmative defense." *Chouteau Auto Mart, Inc. v. First Bank of Mo.*, 55 S.W.3d 358, 360 (Mo. banc 2001) (emphasis omitted).

 The substantive Missouri law governing Appellants' claims against Crico and Equity Residential was set forth in *Harris v. Niehaus*, 857 S.W.2d 222 (Mo. banc 1993). "When a plaintiff sues a possessor of land for injuries arising out of an unreasonably dangerous condition on that land, the standard of care owed by the defendant is defined by the relationship existing between the possessor of the land and the plaintiffs." *Id.* at 225. In determining the nature of that relationship, " 'a person who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of land' " is classified as an invitee. *Id.* (quoting Restatement (Second) of Torts, § 332 (1965)).[3] When the injured party is an invitee, a possessor of land is subject to liability for the injuries suffered by the invitee due to a condition on the land only if the possessor (1) knows or by exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to the invitee; (2) should expect that the invitee will not discover or realize the danger or will fail to protect him or herself against it; and (3) fails to exercise reasonable care to protect the invitee against the danger. *Id.* at 225–26 (citing Restatement (Second) of Torts, § 343 (1965)). In gen-

eral, with respect to the second required element, "a possessor's actions do not fall below the applicable standard of care if the possessor fails to protect invitees against conditions that are open and obvious as a matter of law." *Id.* at 226.

 Moreover, "a possessor of land is not an absolute insurer of the well-being of its invitees." *Id.* Rather, a possessor of land is entitled to expect that its invitees will exercise ordinary perception, intelligence, and judgment to discover open and obvious conditions, appreciate the risk they present, and take the minimal steps necessary to avert a tragedy. *Id.* In other words, a possessor of land may "reasonably rely on [its] invitees to see and appreciate the risk presented by" an open and obvious yet dangerous condition on the land, and may "reasonably rely on the invitee's normal sensibilities to protect against such a condition[.]" *Id.* at 227.

In granting summary judgment to Crico and Equity Residential, the trial court found that the existence of the overhead power lines at the rear of Unit 9 of the apartment complex was open and obvious. Appellants argue that summary judgment was inappropriate since the record contains evidence raising genuine issues of material fact as to this issue.

First, they point to Mayfield's deposition testimony, which established that he inspected the property for approximately four to five hours before making a bid to paint the apartment complex and that he made a few subsequent trips to the property while the painting work was in progress. "If the power lines were open and obvious," they reason, "Mayfield would have discovered them during this four- or five-hour inspection, or his subsequent vis-

---

**3.** The parties agree, and the trial court found, that Dority was an invitee since he was on Crico's property for the business purpose of

painting the apartment buildings owned by Crico and managed by Equity Residential.

its to the complex." Although this argument has substantial intuitive appeal, as illustrated by the following extracts from Mayfield's deposition, it is conclusively refuted by the summary judgment record:

A.: The power lines were actually at the very end of the complex.

Q.: Did you go back to the very end?

A.: No.

Q.: Did you do that when the work started when you came and talked to Mr. Roop [Dority's supervisor] and explained the project to him?

A.: I actually did not go to the back of that building.

Q.: At any time before Mr. Dority's accident, did you ever see the power lines?

A.: No.

\* \* \* \*

Q.: Was there any reason for you not to have seen them other than you just didn't go back in that area?

A.: I didn't go back in that area.

Q.: There wasn't anything concealing them from view, was there?

A.: No.

Q.: They were out in the open?

A.: That's correct.

Q.: If you were in that area, they were obvious?

A.: Yes.

\* \* \* \*

Q.: Did you have any difficulty seeing the power lines?

A.: Not when you get back there.

\* \* \* \*

Q.: As far as you know, as far as you could tell, the power lines were out in the open and they were obvious?

All you had to do was look? Is that right?

A.: Yeah. If you look, you can see them.

Q.: They weren't in the middle of the trees or anything like that?

A.: No.

Q.: They weren't hidden in any way?

A.: No.

Q.: There was nothing to obscure a human being's view of the power lines if you were there at the back of the building?

A.: No.

\* \* \* \*

Q.: Nobody else was on the ladder on Building 9?

A.: Not in the vicinity of the power line.

Q.: Nobody carried a ladder to Building 9?

A.: Not in the vicinity of the line. The line was at the very end of the building, and he [Dority] was the only one who worked around that end of the building.

\* \* \* \*

Q.: During your subsequent visits after the bidding process at the Ethans complex, what did you go there for? Inspection—supervision? Inspection? Quality control?

A.: Yes.

Q.: Your testimony is you never saw any overhead power lines prior to—

A.: The accident.

Q.: I'll just call it the incident at issue. Okay?

A.: That's correct.

\* \* \* \*

Q.: And you also told us earlier that you didn't see the lines before the accident occurred, but I think that's due

to the fact that you just never went back to the area of the complex. Am I right about that?

A.: That's correct.

Q.: Was there any reason that you didn't see the lines other than you just didn't happen to go back there in bidding the job?

A.: No. That's it.

While this testimony clearly indicates that Mayfield's pre- and post-bid inspections of the property were less than completely thorough and would support a claim that he negligently inspected Dority's workplace for the existence of potential safety hazards before directing him to begin working there, it is insufficient to support even an inference that the presence of the overhead power lines was not open and obvious to anyone, who, like Dority before and at the time of the accident and Mayfield afterward, was located in close proximity to them.[4]

 Anticipating this conclusion, Appellants also point to the following deposition testimony of Mayfield, which was elicited during his cross-examination by counsel for Appellants:

Q.: Okay. I understand where you are coming from. You said you weren't aware of the power lines. You never saw them before on any of your numerous trips. Is that your testimony?

A.: Yes.

Q.: When the crew eventually did get to the area of the building where the power lines were, which you said— well, I'm not going to say what you

said. Were they—could you observe them easily?

A.: Yes. You could.

Q.: Okay. So is it a logical conclusion that when your crew—or somebody that was working on Building 9, including my—including Mr. Dority—knew the power lines were there before they began working on Building 9?

A.: I don't know whether they were there—whether they knew they were there or not because I—no one said anything to me about the power lines.

Q.: I understand that. Do you think it's more likely than not that they knew the power lines were there if—

Q.: That's fine. You can answer—before they even began work on the building where Mr. Dority was electrocuted?

A.: It's very common that you don't look up when you are working. You look at what's in front of you. You walk into a building, you know, you don't know what's on the ceiling. And that's the same case there. Everybody looks in front of them what they are doing. And it was above and behind him. I can see somebody working there and not being aware of them.

\* \* \* \*

Q.: Let me ask you this: Do you think you would have seen them if you would have walked back there?

A.: I could see it either way. Again, when you are doing something, you

---

4. The summary judgment record also contains several photographs of the rear of Unit 9 of The Ethans, where Dority's accident occurred. These photographs, which were taken by KCP & L two days after the accident occurred, demonstrate beyond cavil that the presence of the overhead power lines in question was "open for view, obvious and ascertainable by the slightest effort to look." *Hokanson v. Joplin Rendering Co.,* 509 S.W.2d 107, 113 (Mo.1974).

look forward. You have a tendency not to look above and behind you. And that's where the lines were. When you walk around there, you walk around looking at the building. And the lines were above and behind you. It's very—I mean, we all walk into places and don't notice what's above and behind us.

Q.: So you could see the way you might have seen it, you might not have seen it?

A.: I could see that.[5]

Appellants argue that since Mayfield "stated he could see why John Dority might not have seen the power lines at all when working around Building 9," the trial court erred in granting summary judgment on the issue of whether existence of the lines was open and obvious. Respondents Crico and Equity Residential meet this claim by stating that, under the circumstances here, "[t]he argument that John Dority may or may not have seen them [the lines] is totally irrelevant. He reasonably should have seen them, as a matter of law." We agree.

As stated in *Harris*, possessors of land "are entitled to expect that their invitees will exercise ordinary perception, intelligence and judgment" to discover the presence of conditions on the land which are "open and obvious to all who would encounter" them. 857 S.W.2d at 226. Indeed, our Supreme Court has gone so far as to say that a worker, in circumstances similar to those in this case, *has a duty to look. Dalby v. Hercules, Inc.*, 458 S.W.2d

274, 279 (Mo.1970). In *Dalby*, an injured worker claimed, among other things, that he did not see either the overhead power lines or the poles to which they were attached despite their "open and obvious" presence at the worksite. *Id.* The Missouri Supreme Court held that the worker "had a duty to look, and to look was to see what was plainly apparent had he looked, so that, in the eyes of the law, he knew of the existence and location of the power lines." *Id.* (internal citations omitted). While this language has not once been cited in the thirty-five years since *Dalby* was handed down, it is not for this court to say when or whether the holding should be revisited by our Supreme Court. Rather, we are, of course, bound by *Dalby* as the most recent controlling decision of our Supreme Court. *Thomas v. Depaoli*, 778 S.W.2d 745, 747 (Mo.App. S.D.1989). Accordingly, since Dority would have discovered the presence of the lines had he carried out his duty to look, Appellants cannot avoid summary judgment on the basis that he did not look.

Next, citing *Dieterich v. Pickett*, 114 S.W.3d 293, 296 (Mo.App. W.D.2003), and *Lewis v. Snow Creek, Inc.*, 6 S.W.3d 388, 393 (Mo.App. W.D.1999), for the proposition that both the presence and the dangerousness of the condition on the land must be open and obvious, Appellants argue that even if the *presence* of the power lines was open and obvious to Dority, their dangerous *condition* and the nature of the peril they posed were not. On this issue, the trial court found that "a person exer-

---

**5.** As noted by Crico and Equity Residential in their brief, there were numerous objections by opposing counsel to much of this testimony, all of which were omitted in the colloquy quoted above for the sake of simplicity. These included objections to the form of the question, that the question had been asked and answered, that the question called for the witness to speculate, and that the question was argumentative. The record does not indicate whether the trial court ever expressly ruled on any of those objections. Since, as will be seen, it ultimately does not matter, for purposes of this appeal, we will assume, without deciding, that this evidence was properly admitted into the summary judgment record over those objections.

cising reasonable care would have appreciated the danger posed by the lines" to anyone coming in contact with them.

■ Persons of ordinary intelligence are presumed to know the dangers attending contact with electrically charged wires. *Chandler v. City of Independence,* 640 S.W.2d 175, 177 (Mo.App. W.D.1982). It is conceded by all that Dority was a person of ordinary intelligence. He had a duty to look for the wires and, in the eyes of the law, is presumed to have known of the existence of the power lines. *Dalby,* 458 S.W.2d at 279. "Under those conditions he is presumed to understand and appreciate the dangers attendant to contact with the wires." *Chandler,* 640 S.W.2d at 177. As explained in *Chandler,* Dority

> was alerted to the danger from which his death arose by his knowledge of the presence of the lines and of the danger involved if the [ladder] made contact with them. All of the dangers which caused the injury were fully revealed to [Dority]; the existence of the lines, the proximity of the lines to the place where he was standing, the length of the [ladder], and the danger posed if the [ladder] made contact with the electrical lines.

*Id.* Accordingly, the trial court did not err in ruling as it did on this issue.

■ Finally, Appellants urge us to invoke the exception to the "open and obvious danger" rule recognized by our Supreme Court in *Harris:* "[W]hen the dangerous condition is so open and obvious that the invitee should reasonably be expected to discover it and realize the danger, a possessor of land does *not* breach the standard of care owed to invitees 'unless the possessor should anticipate the harm despite such knowledge or obviousness.'" 857 S.W.2d at 226 (quoting RESTATEMENT (SECOND) OF TORTS, § 343A(1) (1965)) (emphasis in original).

Although they cite no authority for the proposition, they claim that, despite the open and obvious nature of the dangerous condition on the land, Crico and Equity Residential should nonetheless have anticipated that an invitee painting the rear of Unit 9 would be electrocuted. We disagree.

■ "Everyone has the duty to exercise due care for his own safety[.]" *Dalby,* 458 S.W.2d at 277. In particular,

> [l]andowners are entitled to expect that their invitees will exercise due care. Due care mandates that invitees take available precautions to protect themselves from open and obvious dangers. The exception to the "open and obvious danger" rule applies where a landowner should foresee that invitees, even if using reasonable care, would not appreciate the danger associated with the risk or would be unable to protect themselves from it.

*Huxoll v. McAlister's Body & Frame, Inc.,* 129 S.W.3d 33, 35–36 (Mo.App. W.D.2004) (internal citations omitted).

The facts of this case do not fit within the exception, since Appellants have failed to explain why Respondents Crico and Equity Residential should have expected that Dority, after exercising due care, would be unable to protect himself from the obvious risk of danger presented by the overhead power lines running behind Unit 9. As noted *supra,* "a possessor of land is not an absolute insurer of the well-being of its invitees," but is entitled to expect that they will exercise ordinary prudence and judgment to "take the minimal steps necessary to avert a tragedy" arising from an open and obvious yet dangerous condition on the land and may reasonably rely on them "to employ the simple means at their disposal to prevent this harm from occurring." *Harris,* 857 S.W.2d at 226, 227; *see*

*also Huxoll,* 129 S.W.3d at 36, 37. Clearly, this tragedy could have been avoided if Dority had simply carried his uninsulated aluminum ladder in a horizontal rather than vertical position while he was moving the ladder in proximity to the overhead power lines some fifteen to twenty feet away from the rear of Unit 9 or if he had used an insulated or non-metallic ladder to perform the work.[6] Point denied.

For all these reasons, the judgment of the circuit court is affirmed.

All concur.

6. Mayfield testified that depending on how close the power lines are to the buildings being painted, he provides his employees with either insulated or fiberglass ladders.